**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| PUMA ENERGY CARIBE, LLC<br><br>        Plaintiff,<br><br>    v.<br><br>COMMONWEALTH OF PUERTO RICO; WANDA VÁZQUEZ GARCED, in her official capacity as GOVERNOR OF THE COMMONWEALTH OF PUERTO RICO; INÉS DEL C. CARRAU MARTÍNEZ, in her official capacity as the Acting Secretary of Justice for the Commonwealth of Puerto Rico; JOHAN M. ROSA RODRÍGUEZ, in her official capacity as the Director of the Office of Monopolistic Affairs at the Puerto Rico Department of Justice; CARMEN SALGADO RODRÍGUEZ, in her official capacity as the Secretary of Consumer Affairs for the Commonwealth of Puerto Rico,<br><br>        Defendants. | ORIGINAL COMPLAINT<br><br><br>Civil Action No.  20-1591 |

**ORIGINAL COMPLAINT**

Plaintiff Puma Energy Caribe, LLC ("Puma"), by and through its undersigned attorneys, brings this Complaint for injunctive and declaratory relief from recent amendments to Puerto Rico's Gasoline Law.  These amendments violate the Commerce Clause; are preempted by the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq*.; and take Puma's property without just compensation, thereby violating the Federal and Puerto Rico Takings Clauses.  For all those reasons, Puma seeks declaratory relief and an injunction against the enforcement of Law 60.  In the alternative, Puma seeks an award of money damages to compensate Puma for the taking of its property.

## Table of Contents

INTRODUCTION .................................................................................................. 3

THE PARTIES...................................................................................................... 4

JURISDICTION AND VENUE ........................................................................... 6

FACTUAL ALLEGATIONS ................................................................................ 6

    I.    Historical Background and Structure of the Market ............................ 6

        A.    Puerto Rico's 1,100 Gasoline Service Stations Sell Gasoline to Consumers.................................................................................. 6

        B.    In Addition to Gasoline Retailers, Other Businesses Also Operate on the Premises of Puerto Rico's Retail Gasoline Service Stations .......... 7

        C.    Puerto Rico's Gasoline Wholesalers........................................... 7

    II.    Law 60 Prohibits Wholesalers from Exercising Any Control Over Other Businesses Located on the Premises of a Gasoline Service Station ................... 11

    III.    The Purpose and Effect of Law 60 Was to Discriminate Against Off-Island Wholesalers and In Favor of On-Island Businesses................................. 13

        A.    Law 60 Was Intended to "Protect" Local Businesses from Off-Island Wholesalers like Puma................................................. 13

        B.    Law 60 Serves Its Intended Purpose:  Its Effect Is to Benefit *On-Island* Interests, Namely, Dealers and Other Businesses, at the Expense of *Off-Island* Wholesalers ....................................... 16

        C.    The Supposed Purposes of Law 60 Were Pretextual ............................ 18

    IV.    Law 60 Is a "Taking" of Puma's Property........................................... 21

CAUSES OF ACTION ....................................................................................... 24

    I.    Count One - Violation of the Commerce Clause of Article I, Section 8 of the U.S. Constitution, and of the Federal Relations Act, 48 U.S.C. § 741a (Against the Defendant Officials).......................................................... 24

    II.    Count Two – Preemption By the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 (Against the Defendant Officials) ................................. 25

    III.    Count Three – Taking of Private Property Without Just Compensation – Declaratory and Injunctive Relief (Against the Defendant Officials) ................ 29

    IV.    Count Four – Taking of Private Property Without Just Compensation – Monetary Relief (Against the Commonwealth of Puerto Rico) ......................... 30

PRAYER FOR RELIEF ..................................................................................... 30

**INTRODUCTION**

1.     Puma is a gasoline wholesaler that owns or leases the real property at 245 gasoline service stations across Puerto Rico.   Thanks to Puma's significant and ongoing capital expenditures, these properties have been improved so that they now accommodate many other businesses in addition to selling gasoline.   For example, Puma and its predecessors in interest have built convenience stores, car washes, restaurants and repair garages on its properties.   Until recently, Puma had plans to build another 62 convenience stores on these properties.   Puma invested in these properties based on Puma's expectation of exercising significant operational control over these other businesses.   That operational control is important to Puma because the other businesses are located on Puma's properties and because most of them carry the Puma brand.

2.     On June 27, 2020, Puerto Rico enacted Law 60, which prohibits Puma from exercising any operational control over other businesses on its property.   This law is a purely protectionist measure.   It was intended to devastate Puma's business plans because Puma is an off-island company.   It was intended to protect local businesses from control by, and competition from, off-island wholesalers.   Law 60 is having just these intended effects.

3.     The direct beneficiaries of Law 60 are locally owned businesses—among them, the gasoline retailers ("dealers") whose trade association was the moving force behind Law 60.   The key sponsor of Law 60, Senator Carmelo Ríos, stated that the purpose of Law 60 was to "protect" the "people who are from here" from off-island wholesalers who would, he warned, remove Puerto Ricans from jobs, "stifle each and every one of the locals," bring in "people from Central America," and "pull millions of dollars out of the [local] economy."

4.     Puma brings this lawsuit against the officials charged with enforcing Law 60, and respectfully seeks declaratory and injunctive relief for three reasons:  First, Law 60 violates the

Commerce Clause and the Federal Relations Act; second, Law 60 is preempted by the federal

Petroleum Marketing Practices Act (PMPA); and third, Law 60 is a "taking" of Puma's property

for which Puma has not been paid just compensation.   In the alternative, Puma seeks money

damages from the Commonwealth of Puerto Rico sufficient to compensate Puma for the taking of

Puma's property.

## THE PARTIES

### *Plaintiff*

5.      Puma is a limited liability company organized pursuant to the laws of the

Commonwealth of Puerto Rico.  Puma's physical address is Road #28, Km 2.0, Luchetti Industrial

Park, Bayamón, Puerto Rico 00961, and its postal address is P.O. Box 11961, San Juan, PR 00922.

The sole member (i.e., owner) of Puma is Puma Energy Americas Holding, B.V., which is

domiciled and registered in the Netherlands.  Puma Energy Americas Holding, B.V., is neither a

citizen of Puerto Rico nor domiciled in Puerto Rico.  The ultimate indirect owner of Puma Energy

Americas Holding, B.V. is Puma Energy Holdings Pte Ltd, which is incorporated and

headquartered in Singapore.  Puma is widely perceived in Puerto Rico as being an off-island

company, meaning that Puma is perceived to be owned and controlled by persons and entities that

are located outside of the Commonwealth.

6.      Puma is a gasoline wholesaler.  Puma imports gasoline by ship, and then distributes

the gasoline to hundreds of gasoline service stations across the Commonwealth.  Puma markets

gasoline and related products in Puerto Rico under the "Puma" and "Texaco" brands.  Puma is a

"franchisor" as defined by the Petroleum Marketing Practices Act (PMPA) and is a "wholesaler"

as defined by the Puerto Rico Gasoline Law, Law No. 3 of March 21, 1978, 23 L.P.R.A. § 1101

*et seq*.

7.     Puma has made significant investments in Puerto Rico.  Puma owns the real property at 128 gasoline service stations, and leases the real property at 117 more.  Puma has spent millions of dollars to make capital improvements on those properties.  Puma directly employs 186 people on the Island and indirectly employs more than 1,500 others.  Puma also operates two gasoline terminals in Puerto Rico, which together have a storage capacity of more than 106 million gallons.

### Defendants

8.     Defendant Wanda Vázquez Garced is the Governor of Puerto Rico.  She is sued in her official capacity pursuant to 42 U.S.C. § 1983 and the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), for injunctive and declaratory relief only.

9.     Defendant Inés Del C. Carrau Martínez is the Acting Secretary of Justice for the Commonwealth of Puerto Rico.  She is sued in her official capacity pursuant to 42 U.S.C. § 1983 and the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), for injunctive and declaratory relief only.

10.     Defendant Johan M. Rosa Rodríguez is the Director of the Office of Monopolistic Affairs at the Puerto Rico Department of Justice.  She is sued in her official capacity pursuant to 42 U.S.C. § 1983 and the doctrine of *Ex parte Young*, for injunctive and declaratory relief only.

11.     Defendant Carmen Salgado Rodríguez is the Secretary of Consumer Affairs for the Commonwealth of Puerto Rico.  She is sued in her official capacity pursuant to 42 U.S.C. § 1983 and the doctrine of *Ex parte Young*, for injunctive and declaratory relief only.

12.     Collectively, Defendants Vázquez Garced, Carrau Martínez, Rosa Rodríguez, and Salgado Rodríguez are referred to herein as the "Defendant Officials."  Each of the Defendant Officials is responsible, in their official capacities, for the implementation, interpretation, and/or enforcement of Law 60.

13.     Defendant Commonwealth of Puerto Rico is a territory of the United States.  The only cause of action asserted against the Commonwealth is the claim for money damages sufficient to provide just compensation for the taking of Puma's property.

## JURISDICTION AND VENUE

14.     This Complaint alleges that the Defendant Officials, acting under color of law, violate the Commerce Clause, the Federal Takings Clause, and the PMPA by enforcing and applying Law 60, and seeks declaratory and injunctive relief against the Defendant Officials under 42 U.S.C. § 1983 and the doctrine of *Ex parte Young*.  In the alternative, Puma seeks money damages from the Commonwealth of Puerto Rico, pursuant to the Takings Clause of the Fifth Amendment to the United States Constitution and Section 1983, for the taking of Puma's property. *See Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2168 (2019).  These are all federal questions over which the Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

15.     This Court has supplemental jurisdiction, under 28 U.S.C. § 1367, over Puma's claim arising under the Takings Clause of the Puerto Rico Constitution.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial number of the events giving rise to the claim occurred in the Commonwealth of Puerto Rico.

## FACTUAL ALLEGATIONS

### I.     Historical Background and Structure of the Market

#### A.     Puerto Rico's 1,100 Gasoline Service Stations Sell Gasoline to Consumers

17.     The retail sale of gasoline to consumers is primarily done at gasoline service stations.  There are approximately 1,100 gasoline service stations in Puerto Rico.  These stations are operated by approximately 1,000 small businesses, known as "dealers."

18.    All but one of Puerto Rico's 1,000 dealers are local, on-island businesses, meaning that they are wholly owned by residents of Puerto Rico.[1]  These local businesses may take a variety of corporate forms (sole proprietorship, partnership, LLC, etc.).  Many of these local companies, as further described below, have franchise agreements with large gasoline wholesalers, such as Puma, Sol Petroleum, and Total.  Notwithstanding that franchise relationship, however, these dealers are local businesses.

19.    Since 1996, wholesalers have been barred by Puerto Rico's Gasoline Law from owning or operating a gasoline service station.  Therefore, none of the retail dealers, described above, are owned or operated (in whole or in part) by a wholesaler.

**B.    In Addition to Gasoline Retailers, Other Businesses Also Operate on the Premises of Puerto Rico's Retail Gasoline Service Stations**

20.    In addition to the retail sale of gasoline, other businesses also operate on the premises of many of Puerto Rico's gasoline service stations.  The term "other businesses," as used in this Complaint, refers to any commercial activity carried out on the premises of a gasoline service station, other than the sale of gasoline.  Typical other businesses include: convenience stores, car washes, auto repair centers, restaurants, food trucks, automatic teller machines (ATMs), and bulletin boards, among others.

21.    Most of the other businesses, operating on the premises of gasoline service stations, are local on-island businesses, meaning that they are wholly owned by residents of Puerto Rico.

**C.    Puerto Rico's Gasoline Wholesalers**

22.    All of Puerto Rico's gasoline is imported by sea.  A wholesaler (1) takes delivery of the gasoline (either by importing it, or by buying it from an importer); (2) stores the gasoline if

---

[1] The one exception to this rule is the service station operated by Costco.

necessary; and then (3) further distributes the gasoline, usually by tanker-truck, to the various gasoline service stations located on the island.

23.     Many wholesalers have franchise agreements with the gasoline service stations that buy their gasoline.  Under such a franchise agreement, the retail business typically gains access to the wholesalers' brand and many other resources (e.g., marketing, training, back-office support), in exchange for a franchise payment to the wholesaler.

24.     Some wholesalers also own or lease the real property on which the gasoline service station sits, and then lease or sub-lease that property to the dealer.  When the wholesaler owns the property, the gasoline service station is referred to by the term CODO (Company Owned-Dealer Operated).  When the wholesaler leases the property, the gasoline service station is referred to as CLDO (Company Leased-Dealer Operated).  When the wholesaler neither owns nor leases the real property, the gasoline service station is referred to as DODO (Dealer Owned-Dealer Operated).  In these names, the word "Company" refers to the wholesaler, and the word "Dealer" refers to the retail business that operates the service station.

25.     In the case of CODO service stations, and to a lesser degree CLDO service stations, the wholesaler usually makes significant capital investments in the real property.  For example, in addition to buying or leasing the land, the wholesaler will often build or upgrade the existing buildings, parking lots, driveways, and landscape, and then will spend additional money maintaining the property and these improvements to it.

26.     There are currently ten gasoline wholesalers doing business in Puerto Rico:

| Wholesaler | Locally owned? | Number of branded of retail stations | Number of CODO branded retail stations | Number of CLDO branded retail stations | Number of DODO branded retail stations | Market share Aug 2020 (volume sold) | Brand name(s) |
|---|---|---|---|---|---|---|---|
| Puma | OFF-ISLAND | 286 | 128 | 117 | 41 | 17.8% / 260,639 Bbls | Puma, Texaco, Super 7 |
| Total Petroleum | OFF-ISLAND | 196 | 94 | 4 | 98 | 14.% / 204,238 Bbls | Total, Bonjour Stores |
| Best Petroleum Corp. | LOCAL | 195 | 31 | 10 | 154 | 22.5% / 329,600 Bbls | Gulf, Phillips 66 |
| Sol Petroleum | OFF-ISLAND | 172 | 76 | 8 | 88 | 28.9% / 422,583 Bbls | Shell |
| Peerless | OFF-ISLAND | 84 | 14 | 4 | 66 | 5.2% / 76,000 Bbls | Ecomaxx |
| BVI | LOCAL | 36 | 6 | 15 | 15 | 4.1% / 59,807 Bbls | Cabo Rojo Gas |
| Toral | LOCAL | 28 | 7 | 0 | 21 | 3.6% / 53,333 Bbls | Toral, To Go Stores |
| American Petroleum | LOCAL | 14 | 2 | 1 | 11 | 1.5% / 21,667 Bbls | American, Petro Canada |
| Any Time | LOCAL | 13 | 0 | 1 | 12 | 1.5% / 21,667 Bbls | Anytime |
| Bita Oil | LOCAL | 13 | 0 | 0 | 13 | 0.9% / 13,753 Bbls | Clark |

27.     As the above chart indicates, the wholesale market is dominated by the four off-island wholesalers.  Four of the five largest wholesalers are *off-island* companies, meaning that: (a) they are owned by non-Puerto Rico corporate interests; (b) their ultimate corporate headquarters are located outside of Puerto Rico; and (c) they are perceived, by the Puerto Rican public and the legislature, as being non-Puerto Rican.   Together the four off-island wholesalers have 738 gasoline service stations in their franchise networks—approximately *two and a half times more* than the on-island wholesalers (just 399).

28.     The off-island wholesalers also own or lease the real property at far more service stations than on-island wholesalers.  The off-island wholesalers own (CODO) the real property at 312 service stations—more than *six and a half times more* than the on-island wholesalers (just 46). The off-island wholesalers lease (CLDO) the real property at 133 gasoline service stations, nearly *five times more* than the on-island wholesalers (just 27).  Puma owns or leases the property at 245 (86%) of the gasoline service stations in its franchise network.  Total owns or leases the property at 98 (50%) of the gasoline service stations in its franchise network.  Sol owns or leases the property at 84 (50%) of the gasoline service stations in its franchise network.

29.     In comparison to the off-island wholesalers, the local on-island wholesalers own or lease comparatively few real properties in their franchise networks.  Best Petroleum, the largest of the on-island wholesalers, owns or leases property at just 41 (20%) of the gasoline service stations in its network.  The on-island wholesalers' business model is dominated by DODO stations (in which the dealer owns the real property)—this is true of 75% of the on-island wholesalers' franchise network (226 of 299 stations).  By contrast, Puma's network is just 14% DODO stations (41 of 286).

30.     Owning or leasing the real property at the gasoline station matters for purposes of Law 60 because these property rights confer, on the owners or lessors, much greater power to control the operation of other businesses on the owned or leased premises.  Off-island wholesalers therefore lost far more property rights, as a group, than did the on-island wholesalers.

31.     Prior to Law 60, Puma and Total both exercised significant operational control over the other businesses located on the gasoline service stations in their franchise networks.

32.     On information and belief, no other wholesaler, in practice, exercised significant operational control of the other businesses located on the gasoline stations in their franchise networks.

## II.     Law 60 Prohibits Wholesalers from Exercising Any Control Over Other Businesses Located on the Premises of a Gasoline Service Station

33.     Since at least 1996, Puerto Rico's "Gasoline Law" has prohibited wholesalers from directly or indirectly operating, or exercising operation control over, the gasoline service stations. Law No. 3 of March 21, 1978, 23 L.P.R.A. § 1101 *et seq.* (Gasoline Law).  This law also required wholesalers to provide uniform pricing to their franchise network of retailers.  23 L.P.R.A. § 1104. Many other states have similar laws.  Puma is *not* challenging the Gasoline Law's restrictions as they were interpreted prior to Law 60.

34.     Until Law 60, the Gasoline Law's restrictions applied only to the sale of gasoline. Wholesalers were permitted to operate, and to exercise operational control over, other businesses located on the premises of gasoline service stations.

35.     On June 27, 2020, Puerto Rico's Governor signed Law 60, which drastically increased the reach and scope of the Puerto Rico Gasoline Law.  Exhibit A to this Complaint is the text of Law 60.

36.     Law 60 redefined the statutory term "retail service station" to include "any and all commercial activity carried out on the premises."  Ex. A, Law 60, § 1.  The effect of this amendment is to prohibit wholesalers from having any direct or indirect control over the operations of any other businesses (e.g., car washes, convenience stores, auto repair centers, ATMs, restaurants) being conducted on the premises of a gasoline service station.

37.     Law 60 also amended Article 4-A of the Gasoline Law, entitled "Operational Dissociation," to expand the prohibitions on wholesalers' operational control over other businesses.  As amended by Law 60, Article 4-A requires "complete operational dissociation" between the wholesaler and other businesses.[2]  In addition to requiring "complete operational dissociation," Article 4-A also specifically prohibits a wholesaler from exercising any control, "directly or indirectly," over the "products" and "services" that the other business sells or over the "price" that the other business charges.

38.     These amendments have the intended and actual effect of prohibiting wholesalers from exercising any control, direct or indirect, over the operation of other businesses being carried out on the premises of a gasoline service station.

39.     Law 60 thereby purports to rewrite and partially nullify Puma's existing contracts with the companies operating other businesses on Puma's premises.  For example, Puma's contracts with the convenience store businesses, now operating on Puma's premises, contain

---

[2] The relevant text of Article 4-A, as amended by Law 60, reads:

> No petroleum refiner, producer or wholesale distributor may … operate, directly or indirectly, a retail service station in a manner such that their complete operational dissociation is prevented. No petroleum refiner, producer or wholesale distributor may … impose, require, fix, or limit, directly or indirectly … the products and/or the services that the retailer may offer at the retail service station (except for petroleum derivatives and lubricants that the wholesaler produces and has available); and/or the price that the retailer will offer the products and services for.

clauses that give Puma the right to determine what products the store sells; to determine where those products are displayed within the store; and to determine the prices charged for those products.   Under Law 60, those and many other contract provisions are now unenforceable.

40.     Another part of Law 60, Section 3, hands local interests a powerful legal weapon: a private cause of action.  Anyone who claims that his "business or property" are "adversely affected" by a violation of Article 4-A can sue the wholesaler and recover damages plus attorneys' fees.  *See* Ex. A, Law 60, section 3 (amending Article 8 of the Gasoline Law).  Previously, the Gasoline Law had no private cause of action, and was enforceable only by the Department of Justice.  *Id.* at 2 ("Statement of Purpose").

41.     Law 60 appears to be unique in the United States.  On information and belief, no state in the Union has enacted anything similar to it.  Everywhere else within the United States, it is common for gasoline wholesalers to exercise operational control over other businesses on the premises of gasoline service stations.

III.    **The Purpose and Effect of Law 60 Was to Discriminate Against Off-Island Wholesalers and In Favor of On-Island Businesses**

    A.    **Law 60 Was Intended to "Protect" Local Businesses from Off-Island Wholesalers like Puma**

42.     The Puerto Rico Gasoline Retailers Association, Inc. ("ADG", for its acronym in Spanish, "Asociación de Detallistas de Gasolina de Puerto Rico") is an association founded in 1957 with the express purpose of furthering the interests of Puerto Rican gasoline dealers. According to its website, it is the only such organization in Puerto Rico. ADG claims that more than 50% of Puerto Rico's gasoline retailers (dealers) are members.  All of ADG's members are on-island businesses, meaning that they are owned, controlled, and staffed by residents of Puerto Rico.

43.     ADG was the driving force behind the enactment of Law 60.  ADG drafted the text of Law 60 and was the principal lobbying force for it.

44.     In 2018, the ADG procured the support of Senators Eric Correa and Carmelo Ríos Santiago.  Since January 2017, Senator Ríos has been the Majority Leader of the Senate.

45.     In November 2018, Senator Ríos introduced Senate Bill 1146—the bill that became Law 60.

46.     On February 10, 2020, the introductory session of the Senate, Senator Ríos spoke on the Senate floor regarding Puma and other off-island gasoline wholesalers.  He gave his colleagues a preview of the Law 60 bill that would be arriving soon for their votes, and he explained that Law 60 was intended to prevent wholesalers from "displacing" the "locals" and "Puerto Ricans":

> The wholesalers, in this case Puma, are putting on the [dealers] these things called "super stores," where they are sold an idea—of, 'we're going to remodel the store, you are going to continue operating it,' and they have invented a new scheme . . . where they have people who work for them and they go kicking out the dealers . . . ***what they are doing is displacing the locals***.  . . . . They are people who are supporting the Puerto Rican economy, these are people who are in my community, these are people who have called this their home.  And this already happened once—do you remember the Golden Arches, McDonald's, that had more than 200, 300 Puerto Ricans who were restaurant owners?  Now there are fewer than two, ***they were kicked out*** and they are managed corporately.  Puma today, Puma, which tried to get into the gas business, but there was a *jibarito* that got them pretty good and they stopped—but the objective was to lower the prices brutally, ***kick out the locals*** and then keep a monopoly.  Well let's be clear.  This time . . .we are getting into their suspicious practice of ***strangling the local dealers*** . . . .
>
> Puma arrived here, and we were grateful to it for deciding to park itself in Puerto Rico, but they are trying to establish a monopoly by ***kicking out the Puerto Ricans and the people who have 50 years in the world of gasoline***.  They are doing it with subterfuge, they are doing it with predatory practices, and if DACO [Department of Consumer Affairs] doesn't get involved, we in the Senate are going to do it, because that's enough now, now that is enough. . . . .  This is our position in favor of the Puerto Rican people, like it or not.

47.     On February 11, 2020, while hosting the radio show called "Sin Miedo," Senator Ríos spoke at length to the public radio audience about Law 60 and its purpose.  Senator Ríos said

that Law 60 was intended to protect "locals" from Puma.  Specifically, he accused Puma of price-discrimination against "the people who are from here, like Alex Delgado, Alejandro, and me, who have gasoline stations."  Ex. B, at 2.

48.     Senator Ríos also accused Puma of taking jobs away from "Puerto Ricans" and giving the jobs to "Central Americans."  He described Law 60 as a blow for "the locals" against wholesalers who don't "leave the money in Puerto Rico":

> **[Puma] took all of the Puerto Ricans who were here and took them out of management and brought in people from Central America** . . . they took the locals out, and what they are doing is **they are trying to stifle each and every one of the locals . . . .**
>
> [Gasoline wholesalers] went and **took out all the local people** and they imposed conditions on them, where only the parent company can operate them, and they are operated by **a corporation from Argentina** now. So, they are not even from here. So, I say… Why is Carmelo [Ríos] getting into this? It's simple. It is because **they are drowning the local economy and then these people don't leave the money in Puerto Rico**, **nor do they have houses here, nor do they live here, and they pull those millions of dollars out of the economy.**

49.     Nine days later, on February 20, 2020, the Senate discussed and voted on Law 60.

50.     On that date, near the beginning of the session, Senator Ríos made another speech on the Senate floor, in which he addressed Law 60 as well as other legislative proposals.  In his speech, Ríos repeated his accusations against Puma.  He also stated that Law 60 would "protect— and that is the correct word—protect" Puerto Rico's dealers from the "practices" of "wholesalers." Shortly thereafter, addressing another piece of business, Senator Ríos made his protectionist views even more plain:  "Some will ask, with some reason, if this isn't a protectionist measure?  If this isn't a measure that accommodates the locals?  Yes.  Because what interests me is that others come to do business in Puerto Rico, but that their money stays in Puerto Rico."

51.     Later during the February 20 session, Senator Ríos again rose, specifically to urge his colleagues to vote for Law 60.  He accused wholesalers of exercising operational control over

other businesses ("mini stores," "super stores") in order to cause "the dislodging, the strangling" of dealers.  He promised that Law 60 "can protect our dealers."  "This project," he said, referring to Law 60, "will have an effect on all of the Puerto Ricans and on ***thousands of Puerto Rican employees who are under threat*** now because the profiteers [*acaparadores*], the wholesalers know that there was a door that now is being shut and that is what we are doing here.  We are ***protecting thousands of Puerto Rican jobs here***."  He concluded:  "So let there be competition, and let the lowest price and the best quality win, but ***always keeping in mind that this is an economy for the Puerto Ricans, those of us who live here***.  So those are my words, Mr. President."

52.     After Law 60 became law, ADG released a press release "announc[ing]" that the law had "increase[ed] the protections provided to retailers."   In the same release, ADG "celebrate[d]" that Law 60 had "prevent[ed] attempts by certain wholesalers to take over the operation of the retailers' businesses."

**B.      Law 60 Serves Its Intended Purpose:  Its Effect Is to Benefit *On-Island* Interests, Namely, Dealers and Other Businesses, at the Expense of *Off-Island* Wholesalers**

53.     Law 60 is targeted at *off-island* wholesalers.  At the time the law was conceived, drafted, and enacted, there were, on information and belief, only two wholesalers exercising operational control over a significant number of other businesses: Puma and Total.  Both of these are off-island companies.  The Legislature intended Law 60 to harm these two wholesalers because of their status as off-island companies.  Law 60 carries out the Legislature's discriminatory intent by forbidding these two off-island wholesalers from operating, or controlling the operation, of any other businesses located on the premises of a gasoline service station.

62.     On information and belief, Law 60 does not affect any on-island wholesalers.  That is because, on information and belief, on-island wholesalers (a) do not currently exercise any

operational control over the other businesses at gasoline service stations, and (b) do not often own or lease the property at the gasoline service stations.  *See supra* ¶¶  26 & 31.

54.     Law 60 directly benefits on-island businesses in at least three ways.  *First*, Law 60 transfers significant *property* rights to the hundreds of dealers that are located on real property owned or leased by Puma and Total.  (All of these dealers are local, on-island businesses.)  One popular metaphor for property rights is a "bundle of sticks."  *See, e.g.*, *Dolan v. City of Tigard*, 512 U.S. 374, 393 (1994) (describing the "right to exclude others" as "one of the most essential sticks in the bundle of rights that are commonly characterized as property").  Law 60 takes sticks away from wholesaler landlords, and gives those sticks to the dealer tenants.  Such sticks include: the right to use the property to conduct other businesses; the right to exclude other businesses from the property; and the right to sublease the property to other businesses.  If a convenience store on Puma's premises breaks the law by selling alcohol and tobacco to underage customers, Puma is now powerless to re-enter the property and put a stop to it.  If a restaurant on Puma's premises wants to "pivot" its business model and become a massage parlor, Puma cannot prevent that either.

55.     *Second*, Law 60 transfers significant *contractual* rights to the dealers and other businesses, and away from Puma and Total.  Hundreds of contracts are now in force between these local businesses and the wholesalers (e.g., franchise agreements, purchasing agreements, leases).  These contracts currently impose many duties on the local businesses, and confer corresponding rights on the wholesalers to receive the promised performance.  For example, many convenience stores on Puma's property are bound by contract to carry certain products and not others; to purchase from certain designated suppliers; to display the Puma brand; to adhere to Puma's rules; and to honor Puma's marketing and promotional activities (e.g., the FastPay rewards program).

Law 60 erases all these, and also erases any other contractual duties relating to the conduct of other businesses.

56.     *Third*, these local companies also benefit from the new barrier to competition erected by Law 60.  No longer can off-island wholesalers compete with local businesses in the markets for car washes, convenience stores, automobile repair, etc.  All of the properties owned or leased by off-island wholesalers can no longer be used, by those wholesalers, to operate these businesses.  Therefore, in order to obtain any return on their investments in these properties, the wholesalers must find others to run these businesses.  As a practical matter, all of the potential candidates to do this are local firms.  Thus, by design, Law 60 will result in local firms taking over any other business that was operated by an off-island wholesaler.  Law 60 will also shield those local firms from any competition from off-island wholesalers.

### C.     The Supposed Purposes of Law 60 Were Pretextual

57.     The stated reasons for Law 60, given by the Legislature, are pretextual.

58.     Senator Rios's statements, about Puma and other wholesalers "strangling" dealers with "monopoly" pricing, is not merely false, it is an absurdity when offered to explain Law 60.  Not one of Puerto Rico's gasoline wholesalers is in the business of wholesaling any other goods besides petroleum products.  Neither separately nor together do the wholesalers have any kind of market power (much less, monopoly power) over convenience store items, food, or services like auto repair or car washes.

59.     Nor does the Legislature's "Statement of Purpose" offer a coherent explanation for Law 60.  *See* Ex. A, at 2.  The Statement of Purpose asserts that "it is more common" today, than in earlier years, "to see a gasoline station that provides ancillary services, particularly 'Convenience Stores.'"  Ex. A, at 2.  The Statement of Purpose then asserts, correctly, that the old Gasoline Law does not prohibit "wholesale distributors" from operating these ancillary services.

*Id.* But without citing a shred of evidence or giving any explanation, the Statement of Purpose concludes that this state of affairs (i.e., wholesalers operating convenience stores) has had a "terrible effect on the industry." *Id.*

60.     The only attempt at a reasoned explanation, in the Statement of Purpose, is the following: (1) The Gasoline Law barred wholesalers from setting retail petroleum prices or controlling the operations of petroleum retailers; (2) petroleum is sold to consumers at gasoline service stations; (3) other businesses sell their (non-petroleum) goods and services at gasoline service stations; and therefore (4) the Gasoline Law should also restrict wholesalers' control over these other businesses.  This is an *ipse dixit*, not a reason.

61.     The purpose behind the old Gasoline Law (and others like it, enacted across the country following the oil crises of the early 1970s) was to regulate the market for petroleum. Legislatures believed that retail stations operated by wholesalers and producers "had received preferential treatment" in the distribution of gasoline "during the period of short supply." *Exxon Corp. v. Maryland*, 437 U.S. 117, 121 (1978) (upholding Maryland's version of the Gasoline Law). By restricting wholesalers and producers from operating retail stations or setting gas prices, these laws were "designed to correct the inequities in the distribution and pricing of gasoline." *Id.*

62.     Even assuming those reasons for the old Gasoline Law were valid, it simply does not follow that gasoline wholesalers should therefore also be excluded from operating or controlling other businesses, which by definition are not selling petroleum products. The Legislature's Statement of Purpose makes no effort to explain why the old Gasoline Law's prohibition should be extended to the sales of snacks and car washes.

63.     There are no conceivable "inequities" or "shortages" in the distribution or conduct of the other businesses being carried out on the wholesalers' properties.  There have been no

inequities or shortages of snack crackers, caffeinated drinks, windshield wiper fluid, or any other goods sold by these other businesses.  There have been no inequities or shortages of auto repair services, or restaurant services, or any other services sold by these other businesses.

64.    Even if such inequities or shortages were to come to pass in the future, there would be no logical reason to believe that gasoline wholesalers would bear the responsibility for those inequities or shortages.

65.    Law 60 does not create any legitimate benefits for Puerto Rico or the citizens of the Commonwealth.

66.    Law 60 does not benefit Puerto Rico's consumers.  On the contrary, it reduces consumer choice.  By barring wholesalers from operating or controlling the other businesses at gasoline service stations, Law 60 effectively "picks winners" in these retail marketplaces.  Law 60 takes these choices away from consumers.

67.    Law 60 will also harm Puerto Rico's economy because, like all protectionist laws, it deters off-island wholesalers from investing in Puerto Rico.  By deterring investment in these markets, Law 60 will reduce the number and quality of Puerto Rico's gasoline service stations and of the other businesses provided on the premises of those stations.   Because of this law, Puerto Rico's consumers will have less choice; will receive less value; and will be charged more.

68.    The only conceivable benefits of Law 60 are the illegitimate benefits resulting from protectionism.  The sole beneficiaries of Law 60 are the on-island businesses (dealers and other businesses), who are protected by Law 60 (a) from having to yield any control, over their operations, to the off-island wholesalers who own or lease the real property on which these on-island businesses operate; and (b) from having to compete against off-island wholesalers.

**IV.     Law 60 Is a "Taking" of Puma's Property**

69.     By prohibiting Puma from exercising any control, direct or indirect, over "any and all commercial activity" taking place on the real property that Puma owns or leases, Law 60 has effected a "taking" of that property.  Law 60 deprives Puma of many of Puma's property rights. For example, Law 60 deprives Puma of: the right to use the property to conduct retail or service businesses; the right to exclude other businesses from the property; and the right to lease or sublease the property to other businesses.

70.     Puma made significant capital investments in these properties, in reliance upon Puma's belief that Puma would be able to exercise operational control over other businesses on the premises.  For example, Puma purchased the land and made improvements to it in order to accommodate these other businesses.

71.     Puma's existing lease and sublease agreements, with dealers and other businesses operating on Puma's properties, give Puma rights to exercise operational control over the conduct of other businesses.

72.     Exercising operational control over these other businesses is important to Puma for many reasons.  One reason is that many of these other businesses use Puma's brands.  In order to protect customers' perceptions of Puma's brands, it is important for Puma to control the kinds of products and services sold, and the manner of their sale, on Puma's property.  For example, Puma forbids convenience stores, located on Puma properties, from selling: competitor's products; firearms; massages; or "any . . . product or service that, at Puma's discretion, may offend a considerable segment of the public or adversely affect the acceptance of the Puma brand by the public or Puma's reputation."  Law 60 prevents Puma from enforcing its rights to stop these sales.

73.     A second reason why operational control is important is that Puma coordinates marketing and merchandising efforts across hundreds of its franchisees.  For example, Puma offers

customers a "Puma FastPay" loyalty program that allows customers to earn "points" by purchasing gasoline at Puma-branded dealers, and to then redeem those "points" for discounts or free items at Puma-branded convenience stores.   Another example: Puma offers its customers a FastPay smartphone app, which allows customers to make purchases at Puma-branded dealers and convenience stores.   Undertaking these and other merchandising and marketing efforts requires that Puma exercise operational control over the conduct of the convenience stores in its franchise network.   Only by exercising control can Puma ensure that the convenience stores located on its properties honor the promises and commitments that Puma has made to customers.

74.     A third reason why operational control is important is that Puma wants to ensure that the other businesses, operating on Puma's properties, succeed.   Their success is important to Puma for many reasons.   One reason is that Puma's return on its investment, in these real properties, takes the form of rent paid by these other businesses.   Successful businesses are better able to pay their rent.   By exercising various kinds of operational control, Puma helps the other businesses to succeed at providing goods and services that customers want at prices that customers are willing to pay.

75.     Law 60 has already caused Puma to change its business plans.   Before Law 60 was enacted, Puma had developed a concrete business plan to invest approximately $34 million to build convenience stores, carrying the "Super 7" Puma brand, on 62 of Puma's properties.   According to this plan, 20 stores were to be built in 2021, 30 in 2022, and 12 in 2023.   Because of Law 60, Puma will be forced to cancel the plan for the 42 stores that were to have been built in 2022 and 2023.

76.     Law 60 is already affecting Puma's relations with the dealers and other businesses operating on Puma's properties.   For example:

a.     One dealer—currently operating on five Puma properties—sent Puma a formal demand to "revise" its contract with Puma "as a result of the enactment of Law 60." Specifically, the dealer demanded that Puma: (1) remove all requirements that the dealer use Puma's uniforms, brands, and other merchandising in the convenience store; (2) remove all requirements that the dealer follow Puma's instructions regarding the products sold in the convenience store; and (3) remove all restrictions on the uses the dealer could make of the property it was renting from Puma. The same dealer is also invoking Law 60 to attempt to evict a different business (a food truck) from the premises of one of Puma's properties. According to the dealer, Puma's rental of space, to a food truck, is an exercise of "control" over the service station that is forbidden by Law 60.

b.     Another dealer—currently operating on several Puma properties—has informed Puma that the dealer intends to sublease space, on Puma's property, to a different food truck. According to that dealer, Law 60 means that Puma cannot prohibit the dealer from making such a sublease.

c.     Several dealers have stated that they will no longer honor their contractual commitments to purchase convenience-store items from the suppliers selected by Puma. Instead, these dealers have told the suppliers that the suppliers' contracts must be renegotiated with the dealer directly, and without regard to any prior agreements entered into with Puma.

d.     One dealer has stated to Puma that the dealer will refuse to allow Puma to sublease Super 7 convenience stores on the properties where the dealer currently operates. This dealer has invoked Law 60 as the reason why it is entitled to block Puma from granting such

a sublease, and has implicitly threatened to sue Puma for violating Law 60 if Puma were to proceed with the sublease.

## CAUSES OF ACTION

I.  **Count One - Violation of the Commerce Clause of Article I, Section 8 of the U.S. Constitution, and of the Federal Relations Act, 48 U.S.C. § 741a (Against the Defendant Officials)**

77.   Puma incorporates by reference the allegations in paragraphs 1 through 76 above.

78.   The Commerce Clause of the U.S. Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl.  That affirmative grant of power to Congress also limits the power of state, territorial, and local governments to pass legislation affecting interstate commerce.  "[T]he Commerce Clause by its own force restricts state protectionism." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019).

79.   The Commerce Clause forbids state laws that were enacted with a discriminatory "purpose"—protectionism—"or" that have a "discriminatory effect."  *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984).  Law 60 is unconstitutional for both reasons.

80.   Law 60 was enacted for the forbidden purpose of protectionism—namely, to protect on-island firms (dealers and other-businesses) from control by, and competition from, off-island wholesalers.  The Legislature intended to protect the on-island firms because of their local status.  The Legislature intended to exclude off-island wholesalers because of their status as off-island firms.  The sponsor of Law 60, Senator Ríos, made these purposes clear in his statements about Law 60 on the floor of the Senate, and in his other public comments about Law 60.

81.   Law 60 also violates the Commerce Clause because it has the "discriminatory effect" that Senator Ríos and his legislative colleagues intended.  No on-island business is negatively affected by Law 60.  By contrast, the two wholesalers that were exercising operational

control over other businesses—and therefore are negatively affected by the law—are both off-island firms (Puma and Total). Law 60 takes property and contractual rights from Puma and Total, and confers those rights instead on the dealers and other businesses operating on Puma's properties. Those beneficiaries are 100% local.

82. Law 60 also violates the Commerce Clause under the alternative balancing test articulated by *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). The "burdens" on "interstate commerce," resulting from by Law 60, are "clearly excessive in relation to the putative local benefits." *Id.* at 142. Law 60 burdens interstate commerce by preventing off-island wholesalers from exercising operational control over other businesses conducted on their properties, which in turn discourages off-island wholesalers from entering the Puerto Rico market, making investments in Puerto Rico, and conducting business in Puerto Rico. These burdens are "clearly excessive in relation to" Law 60's non-existent "local benefits."

83. For the same reasons that Law 60 violates the Commerce Clause, the statute also violates the Federal Relations Act, 48 U.S.C. § 741a.

## II.   Count Two – Preemption By the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 (Against the Defendant Officials)

84. Puma incorporates by reference the allegations in paragraph 1 through 83 above.

85. The Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* (PMPA) governs the relationships between petroleum distributors like Puma ("franchisors") and retail dealers ("franchisees"). The purpose of the PMPA is to provide uniformity in the law governing petroleum franchise termination and nonrenewal.

86. The PMPA authorizes a franchisor to terminate a franchise agreement for a list of various reasons. 15 U.S.C. § 2802(b)(2). The PMPA also authorizes a franchisor to not renew a franchise agreement for an even longer list of reasons. *Id.* (b)(2) & (b)(3).

87.     The PMPA expressly preempts every state law that conflicts with its provisions "with respect to termination . . . or . . . nonrenewal" of franchise agreements. 15 U.S.C.A. § 2806(a)(1).

88.     Law 60 is preempted because it conflicts with PMPA's provisions regarding termination and nonrenewal of franchise agreements.

89.     Many provisions of Puma's franchise agreement give Puma operational control over aspects of other businesses carried out on the premises of a gasoline service station.  For example, Puma's existing franchise agreements with dealers provide that:

a.      The dealer may not sell non-petroleum products provided by a Puma competitor;

b.      The dealer may not sell pornography, alcohol (unless specifically and expressly authorized by Puma to do so); or "any other product or service that, at Puma's discretion, may offend a considerable segment of the public or adversely affect the acceptance of the Puma brand by the public or Puma's reputation";

c.      The dealer may not permit the consumption of alcoholic beverages on the premises;

d.      The dealer may only sell car wash and auto repair services if Puma consents and if the dealer follows Puma's regulations;

e.      The dealer may only sell soda and food items if Puma consents and if the dealer follows Puma's regulations;

f.      The dealer may not park, store, rent, or sell motor vehicles on the premises;

g.      The dealer may only display signs and posters that meet Puma's rules on appearance, image, and placement;

h.      The dealer may not sublease any part of the gasoline service station to any third party; and

i.      The dealer must tolerate the subleasing, by Puma, of the property to other businesses.

90.     The PMPA authorizes a franchisor to terminate or not renew a franchise agreement because of the franchisee's "failure" to "comply with any provision" of the franchise agreement, "which provision is both reasonable and of material significance to the franchise relationship." *Id.* (b)(2)(A).  The contractual provisions described above are "both reasonable and of material significance to the franchise relationship." *Id.*  If not for Law 60, Puma would terminate, or not renew, a franchise agreement with any franchisee that did not comply with any of these provisions.

91.     But Law 60 prevents Puma from terminating or not renewing a franchise agreement based on a franchisee's failure to comply with any of the contractual provisions listed above, or based on a franchisee's failure to comply with any other contractual provision that relates in any way to the operation of an other business.  If Puma were to terminate or not renew a franchise agreement, in response a franchisee's failure to comply with these contractual provisions, then Puma would thereby violate Law 60 because that termination or nonrenewal would be an exercise of operational control, by Puma, over the dealer.  Because Law 60 prohibits Puma from terminating or not renewing a franchise agreement, for reasons that are authorized by the PMPA, Law 60 is expressly preempted by the PMPA.

92.     The PMPA also authorizes a franchisor to not renew a franchise agreement if the franchisee fails to agree to changes or additions to the franchise agreement, provided that:

(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

15 U.S.C. § 2802(b)(3)(A).

93.    Puma is in the process of seeking changes to its franchise agreements, as they come up for renewal, in order to implement Puma's business plan to build Puma-branded convenience stores on 62 properties owned or leased by Puma. On some of these properties, the changes would govern the franchisee's operation of the convenience store. On other properties, the changes would require the franchisee to tolerate the subleasing, of the store, to a different company that would operate the store. In both cases, these changes are "the result of determinations made by" Puma "in good faith and in the normal course of business," and are not the result of any "purpose" to convert the gasoline service station to "operation by employees or agents of Puma" or to otherwise "prevent[] the renewal of the franchise relationship." *Id.* If not for Law 60, Puma would decide not to renew a franchise agreement with any franchisee that did not agree to these changes.

94.    But Law 60 prevents Puma from not renewing a franchise agreement based on a franchisee's failure to agree to the changes described above. If Puma were to not renew a franchise agreement, in response a franchisee's refusal to agree to operate a convenience store or to tolerate the operation of a convenience store by a third party, then that nonrenewal would be an exercise of operational control, by Puma, over the dealer. Because Law 60 prohibits Puma from not renewing a franchise agreement, for reasons that are authorized by the PMPA, Law 60 is expressly preempted by the PMPA.

III.     **Count Three – Taking of Private Property Without Just Compensation – Declaratory and Injunctive Relief (Against the Defendant Officials)**

95.     Puma incorporates by reference the allegations in paragraph 1 through 94 above.

96.     The Takings Clause of the Fifth Amendment to the United States Constitution provides: "Nor shall private property be taken for public use, without just compensation."  The Takings Clause of the Constitution of Puerto Rico provides, in Section 9 of Article II: "Private property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law."

97.     Puma owns and leases hundreds of real properties in Puerto Rico.  Puma spent millions of dollars to acquire these properties and to improve them.  Puma spent this money based on Puma's expected returns on its investment.  In order to achieve those expected returns, Puma must be able to exercise operational control over the conduct of other businesses on its properties.

98.     Law 60 effects a "taking" of Puma's properties, under the Federal and the Puerto Rico Takings Clauses, because it eliminates or restricts many of Puma's property rights.  Among the property rights that Law 60 eliminates or restricts are: the right to use the property to conduct retail or service businesses; the right to exclude others from using the property; and the right to lease or to sublease the property.

99.     Puma is entitled to a reasonable rate of return on its investment in its properties.

100.     Law 60 deprives Puma of Puma's reasonable, investment-backed expectations of a return on Puma's substantial investments in these properties.

101.     Justice and fairness require that compensation be paid to Puma for this taking.

102.     Puma is entitled to a declaratory judgment that Law 60 effects a taking of Puma's property for which Puma is entitled to just compensation.

103.    Puma is entitled to an injunction against the enforcement of Law 60, until such time as Puerto Rico pays just compensation for the taking.

IV.    **Count Four – Taking of Private Property Without Just Compensation – Monetary Relief (Against the Commonwealth of Puerto Rico)**

104.    Puma incorporates by reference the allegations in paragraph 1 through 103 above.

105.    This cause of action is brought against the Commonwealth of Puerto Rico only, and not against the Defendant Officials.

106.    Puma is entitled to just compensation for the taking of Puma's property, in an amount to be determined at trial.

107.    Puma does not have an adequate remedy, outside of this Court, to obtain the just compensation to which it is entitled.

**PRAYER FOR RELIEF**

**WHEREFORE,** Puma respectfully requests the following relief:

1.    A declaration that Law 60 violates the Commerce Clause and the Federal Relations Act, and a permanent injunction restraining and enjoining the further enforcement or application of Law 60 on that basis;

2.    A declaration that Law 60 is preempted by the Petroleum Marketing Practices Act, and a permanent injunction restraining and enjoining the further enforcement or application of Law 60 on that basis;

3.    A declaration that Law 60 effects a taking of Puma's property, for which Puma is entitled to just compensation, and an injunction against any enforcement or application of Law 60 until such time as Puma is paid that compensation;

4.      An award of monetary damages, following an accounting, sufficient to compensate Puma for the taking of Puma's property, including the profits that Puma has lost and may lose in the future as a result of Law 60;

5.      The costs and expenses of this action, including reasonable attorneys' fees and costs; and

6.      An order granting such other and further relief as may be just and proper.


Dated: October 28, 2020                          Respectfully submitted,


                                                 /s/ Alberto G. Estrella
                                                 Alberto G. Estrella, Esq.
                                                 Bar No. 209403
                                                 ESTRELLA LLC
                                                 PO Box 9023596
                                                 San Juan, PR 00902-3596
                                                 Phone:  (787) 977-5050
                                                 agestrella@estrellallc.com

                                                 Neal Manne (*pro hac vice* to be filed)
                                                 Joseph Grinstein (*pro hac vice* to be filed)
                                                 SUSMAN GODFREY L.L.P.
                                                 1000 Louisiana Street, Suite 5100
                                                 Houston, Texas 77002
                                                 Phone:  (713) 651-9366
                                                 nmanne@susmangodfrey.com
                                                 jgrinstein@susmangodfrey.com

                                                 Steven M. Shepard (*pro hac vice* to be filed)
                                                 SUSMAN GODFREY L.L.P.
                                                 1301 Avenue of the Americas, 32nd Floor
                                                 New York, NY 10019-6023
                                                 Phone:  (212) 336-8330
                                                 sshepard@susmangodfrey.com

                                                 *Counsel for Plaintiff Puma Energy Caribe, LLC*