## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| PUMA ENERGY CARIBE LLC, | |
| Plaintiff, | |
| v. | Civil No.: 20-1591 (DRD) |
| COMMONWEALTH OF PUERTO RICO, et al. | |
| Defendants. | |
| TOTAL PETROLEUM PUERTO RICO CORP., | |
| Plaintiff, | |
| v. | Civil No.: 20-1725 (DRD) |
| COMMONWEALTH OF PUERTO RICO, et al., | |
| Defendants. | |

## OPINION AND ORDER

On October 28, 2020, Puma Energy Caribe LLC ("Puma") filed an *Original Complaint*. *See* Civil No. 20-1591 at Docket No. 1. In essence, Puma contends that Puerto Rico's Act No. 60-2020 ("Act No. 60-2020") is unconstitutional. Puma asserts that Act No. 60-2020, "which prohibits Puma from exercising any operational control over other business on its property [...,] was intended to devastate Puma's business plans because Puma is an off-island company." *Id*. at 3. In attention to said interpretation, Puma requests the Court to provide declaratory and injunctive relief, considering that "[(1)] Law 60 violates the Commerce Clause and the Federal Relations Act; [(2)] Law 60 is preempted by the federal Petroleum Marketing Practices Act (PMPA); and [(3)], Law 60 is a "taking" of Puma's property for which Puma has not been paid just compensation." *Id*. at 4.

Similarly, on December 16, 2020, Total Petroleum Puerto Rico Corp. ("Total") filed a *Complaint*, for declaratory judgement, requesting the Court to find that Sections 2 and 3 of Act. No. 60-2020 are preempted by the PMPA, pursuant to the Supremacy Clause of the United States

Constitution. *See* Civil No. 20-1725, Docket No. 1 at 1. Further, Total raises a claim under 42 U.S.C. § 1983 seeking redress for the deprivation of statutory rights under the color of state law. *Id*. at 39.[1]

The Commonwealth of Puerto Rico; Pedro R. Pierluisi, in his official capacity as Governor of Puerto Rico; Domingo Emanuelli-Hernández, in his official capacity as Designated Secretary of Justice; Johan M. Rosa-Rodríguez, in her official capacity as Interim Deputy Secretary of Antitrust Affairs; and Edan Rivera-Rodríguez, in his official capacity as Designated Secretary of the Department of Consumer Affairs (hereinafter "Defendants"), decided to file two *Motions to Dismiss Pursuant to Rule 12(b)(6) of Federal Civil Procedure* ("*Motion to Dismiss*") as their responsive pleadings in each of the aforementioned cases. *See* Civil No. 20-1591, Docket No. 31.[2] The *Motion to Dismiss* essentially focuses on three matters; first, that Puma failed to plead an actionable claim pursuant to the dormant interstate commerce clause; second, that Act No. 60-2020 is not preempted by the PMPA; and, third, that Act No. 60-2020 does not constitute a "taking" under the Fifth Amendment of the United States Constitution.[3]

---

[1] On March 9, 2021 the Court entered an *Order* where Total's *Motion for Consolidation of Civil Cases* was granted. As a result, Civil Case No. 20-1591 was consolidated with Civil Case No. 20-1725. *See* Docket No. 44.

[2] The Court notes that Defendants filed a shorter version of the *Motion to Dismiss* in Total's case (Civil Case No. 20-1725). Defendants *Motion to Dismiss* in Civil Case No. 20-1725 focuses on challenging Total's claims of preemption under the Supremacy Clause of the United States' Constitution. *See* Civil Case No. 20-1725, Docket No. 13. Taking into account that both of Defendants' *Motions to Dismiss* challenges -almost identically- the preemption claims raised by both Plaintiffs in their corresponding *Complaints*, the Court will analyze both *Motions to Dismiss* as if they were one in the same.

[3] Defendants also argue that Puma's request for monetary relief pursuant to the takings clause of the Fifth Amendment is barred by the Eleventh Amendment of the United States Constitution. *See* Civil Case No. 20-1591, Docket No. 31 at 6-7. In their *Opposition*, Puma candidly admits that their claims in Count IV of the *Complaint*, which is the "only Count that seeks monetary damages", must be dismissed considering that the Eleventh Amendment immunity has been extended to the Commonwealth of Puerto Rico through case law. Further, Puma explains that they "intend to seek appellate review of Puerto Rico's sovereign immunity, from a Takings Clause claim, in light of the Supreme Court's recent decision in *Knick v. Township of Scott*, 139 S.Ct. 2162, 2179 (2019)." Civil Case No. 20-1591, Docket No. 41 at 33-34. The Court fails to see how *Knick* -which involves a Municipality, instead of a state or a state official, and essentially addresses the state forum exhaustion of just compensation claims for government takings under state law- would aid them in their quest as it does not discuss Eleventh Amendment immunity nor its interplay with the self-executing just compensation clause of the Fifth Amendment. Therefore, this Court must apply the law as it stands. *See* Ladd v. Marchbanks, 971 F.3d 574, 579 (6th Cir. 2020), cert. denied, 141 S. Ct. 1390, 209 L. Ed. 2d 129 (2021)(holding that *Knick* does not alter traditional principles of state sovereign immunity); Williams v. Utah Dep't of Corr., 928 F.3d 1209, 1214 (10th Cir. 2019)(same); Bay Point Props., Inc. v. Miss. Transp. Comm'n, 937 F.3d 454, 456 (5th Cir. 2019)(same). As both Parties correctly recognize, federal courts have held that the Eleventh Amendment bars monetary claims, in the context of the Fifth Amendments' self-executing takings clause, against states or state

For the reasons discussed in detail below, the Court hereby **GRANTS IN PART AND DENIES IN PART** Defendants' *Motions to Dismiss* filed in Civil Case No. 20-1591. On the other hand, the Court hereby **DENIES** Defendants' *Motion to Dismiss* filed in Civil Case No. 20-1725.

## I.   ARGUMENTS

### A.   *Arguments as to Puma's Commerce Clause Claims.*

As to the Dormant Commerce Clause claims, first, Defendants contend that Act No. 60-2020 is not discriminatory form its face since it "simply bars all wholesalers, be it in-state or out-of-state, from controlling the convenience stores and other businesses within the gasoline service stations to purport free market competence, fair pricing and avoid convenience store oligopolies, among other legitimate objectives". Civil Case No. 20-1591, Docket No. 31 at 15. Second, they argue that Act No. 60-2020 was not enacted with a discriminatory purpose considering that the statute's plain text and statement of purpose[4] reveal that the Act's aim was to "prevent gasoline wholesalers, producers and refiners [, be that, in-state or out-of-state,] from circumventing the statutory prohibition of operating retail stations by controlling the convenience stores and other businesses within the premises. Also,

---

officials in their official capacities. *See, e.g.,* Ladd v. Marchbanks, 971 F.3d at 578; Seven Up Pete Venture v. Schweitzer, 523 F.3d 948, 955 (9th Cir. 2008); Citadel Corp. v. Puerto Rico Highway Auth., 695 F.2d 31, 33 n. 4 (1st Cir. 1982) (per curiam).

On the other hand, Defendants aver that Puma cannot pursue their Fifth Amendment claim pursuant to Section 1983 since it "does not apply when suing the Commonwealth or its officers in their official capacities for monetary relief." Civil Case No. 20-1591, Docket No. 31 at 7. Further, Defendants contend that the Eleventh Amendment equally bars Puma's request for monetary relief via Section 1983. In response, Puma acknowledges that "under current Section 1983 caselaw, that statute does not provide [Plaintiff] with a cause of action for seeking monetary damages against the Commonwealth." *Id.* at 34. However, they intend to seek appellate reconsideration of this matter as well; albeit, they don't aver any argument to justify said pursuit. As to this point, considering the controlling caselaw, the Court agrees with Defendants. *See* Fredyma v. Com. of Mass., 961 F.2d 1565 (1st Cir. 1992)("Neither states, nor state officials acting in their official capacity, or government entities that are 'arms of the State' are 'persons' under § 1983 for Eleventh Amendment purposes; they cannot be sued for monetary damages."); Toledo v. Sanchez, 454 F.3d 24, 31 (1st Cir. 2006); O'Neill v. Baker, 210 F.3d 41, 47 (1st Cir. 2000); Caraballo v. Commonwealth of P.R., 990 F.Supp.2d 165, 172-174 (D.P.R. 2014) (Dominguez, J.). To that end, the Court hereby **DISMISSES WITH PREJUDICE** Puma's monetary claims asserted in Count IV of the *Complaint* under the Fifth Amendment and Section 1983.

[4] Defendants propose that the Court "needs not resort to Act No. 60's legislative history because the same is not ambiguous and Plaintiff has not even made such a claim […] [i]n that sense, this Court should only focus on the plain text of the challenge statute to analyze Plaintiff's allegation." Civil Case No. 20-1591, Docket No. 31 at 10. However, Defendants add that should the Court consider the legislative intent behind Act No. 60-2020, the Senate's Committee Report "would support that the statute was not passed with protectionist purposes." *Id.* at 12.

Act No. 60 created a new direct private cause of action for persons affected by violations to the statute without the need to file the same through the Antitrust Affairs Office of the Commonwealth's Department of Justice." *Id*. at 11. Third, Defendants aver that Act No. 60-2020 does not discriminate "in effect". Defendants reason that Puma's argument is flawed considering that, first, as wholesalers they are not "similarly situated" to service station operators and, therefore, the analysis of discriminatory effect should not be performed. Moreover, Defendants highlight that "Puma does not state that the statute benefits the in-state wholesalers that are similarly situated but it simply claims that because it owns more service stations, the statute is discriminatory against out-of-state wholesalers." *Id*. at 17.

Fourth, Defendants contend that Puma admitted that it is a "limited liability company organized pursuant to the laws of the Commonwealth of Puerto Rico" and, therefore, must be considered as an in-state wholesaler that "cannot raise an interstate commerce claim arguing that Act No. 60 was discriminatory to out-of-state wholesalers because if favoritism existed it could have not suffered any harm as a result of it." *Id*. at 19. Further, Defendants reason that, if the Court were to consider Puma's contradictory statement that it is also an out-of-state wholesaler, the whole interstate commerce argument would be invalid considering that they assert that "its sole member […] is domiciled and registered in the Netherlands"; that is, Puma's argument would have to be made in the context of foreign commerce, which is not asserted in Puma's *Complaint*. *Id*. Finally, Defendants argue that Puma does not pass the muster of the "*Pike* balancing test" as articulated by the Supreme Court in *Pike v. Bruce Curch, Inc.*, 397 U.S. 137 (1970). Specifically, Defendants find that Act No. 60-2020 "does not burden interstate commerce and, if it does, it is merely incidental." *Id*. at 21. Also, Defendants highlight that Act No. 60-2020 has public benefits that must be considered when implementing the "*Pike* balancing test"; these are: (1) the Act eliminates the possibility of wholesalers from having control over service stations through the businesses within the same; and (2) the Act established a direct cause

of action that would allow claimants to evade the "often-slow administrative process" that has been used up to this point. *Id*.

In response, Puma contends that their claims of discriminatory purpose and, alternatively, discriminatory effect, pass the "plausibility" standard set by Rule 12 (b)(6). *See* Civil Case No. 20-1591, Docket No. 41 at 6-8. Hence, Puma advances the theory that Act No. 60-2020's statement of purpose is nothing but pretext. Plaintiff reasons that Act No. 60-2020 does not state a "harm that needs to be remedied"; instead, it reveals a protectionist purpose. *Id*. at 9. Further, Puma believes that Act No. 60-2020 has a disparate impact between "retailer dealers (all of whom are Puerto Rican Residents) [that] benefit from [Act No. 60-2020], while the law's harm falls solely on two off-island wholesalers: Puma and Total." *Id*. at 10. In support of said theory, Puma references expressions made by the Act's sponsor on the Senate floor and media outlets, and other supporting groups -such as, Puerto Rico's retail dealers' association- which, in Plaintiffs' opinion, reveal the discriminatory purposes of protecting local retailers only. *See id*.

Alternatively, as to the purported discriminatory effect, Puma first contends that the "similarly situated" criteria is met since the effect of Act No. 60-2020 is not at the gasoline retail operation level but in the context of other businesses where they are similarly situated to gasoline retailers who operate them. *See id*. at 15. On the other hand, Puma reiterates the representation that they are "off-island wholesalers" and that they -and Total- are the only wholesalers affected by Act No. 60-2020's effects. As to the *Pike v. Bruce Curch, Inc.* test, Puma avers that the burden Act No. 60-2020 imposes on interstate commerce is clearly excessive, in relation to the putative local benefits. Specifically, Puma contends that Act No. 60-2020 "burdens interstate commerce by preventing Puerto Rico's two off-island wholesalers from exercising operational control over other businesses conducted on their properties, which in turn discourages off-island wholesalers from entering the Puerto Rico market, making investments in Puerto Rico, and conducting business in Puerto Rico." *Id*. at 16. Finally, Puma

avers that discovery is needed to ascertain all of the above referenced arguments; therefore, the Court should deny Defendants' *Motion to Dismiss*.

In their *Reply*, Defendants further their attack on Puma's reliance on Senator Rios' comments as to the purported discriminatory purpose of Act No. 60-2020 and restate the importance of considering the Act's text, the statement of purpose and the corresponding Senate's Committee Report when performing the analysis under the commerce clause. *See* Civil Case No. 20-1591, Docket No. 50 at 4-6. Also, Defendants counter Puma's narrative on discrimination by referencing case law, including *Exxon Corp. v. Maryland*, 437 U.S. 117 (1978), where the Supreme Court explained that merely because "the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce". Exxon Corp. v. Maryland, 437 U.S. at 126. In the *Surreply*, Puma essentially focuses on distinguishing Defendants' cited case law with the facts of the instant case. *See* Civil Case No. 20-1591, Docket No. 59 at 2-4.

### B.  *Arguments as to Plaintiffs' PMPA Preemption Claims.*

Defendants explain that the PMPA was, essentially, "designed to establish a uniform regulation governing the grounds for termination or nonrenewal of a franchise." Civil Case No. 20-1591, Docket No. 31 at 23. Considering said context, Defendants advance the theory that the PMPA "does not govern anything related to a convenience store, carwash of other businesses agreements" and, consequently, "the Commonwealth is within its power to regulate anything related to the convenience store, agreement, including its termination." *Id*. at 25 and 26. Therefore, they conclude that "[Plaintiffs'] claim[s] that termination of a convenience store agreement constitutes the termination of a 'franchise' under the PMPA is baseless." *Id*.

In opposition, Puma first contends that most of the lease agreements they have executed with the gasoline retailers are contracts that fall under the "franchise" definition of Section 2801 of the

PMPA.[5] Total also follows this reasoning and specifically avers that the "secondary agreements" for the establishment of "convenience stores, oil change stations, light mechanic shops, co-branding opportunities, and other business initiatives as part of the franchise agreement is the result of TPPRC's ordinary course of business judgment decision-making to address in good faith changes in market conditions and consumer preferences." Civil Case No. 20-1591, Docket No. 58 at 9. Plaintiffs both reason that these "secondary agreements" are "intertwined and interrelated" with the "franchise" and that said reality is recognized in the text of Act No. 60-2020, the Senate's Committee Report and the Act's purpose which "demonstrates the interdependence between the marketing activities, in this case, the convenience store or other businesses, and the service stations so as to make them one franchise." *Id*. at 21-22.

Taking this context into account, "[b]ecause Law 60 prevents Puma from terminating its 'franchises' (leases) for reasons that are authorized by PMPA section 2802 (b)(2) (i.e., because of a retailer's failure to comply with the lease provisions at issue), therefore Law 60 is preempted by PMPA section 2806 (a)(1)." Civil Case No. 20-1591, Docket No. 41 at 22. Similarly, Total argues that Act No. 60-2020 "expressly: (i) limits [Total's] ability to determine what products or services may or may not be offered at its branded stations; (ii) prohibits [Total's] efforts to incorporate material contract provisions as part of its franchises; and (iii) affords franchisees causes of action to challenge related efforts or to challenge terminations for breach of the material provisions of the secondary agreements, it contravenes the flexibility allowed to the franchisor under the PMPA and, this is preempted under Section 15 U.S.C. § 2806 (a) of the PMPA." Civil Case No. 20-1591, Docket No. 58 at 10.

---

[5] Also, Plaintiffs note that the District Court of Puerto Rico, and the First Circuit, previously examined a franchise agreement between Total and gasoline retailers, which included terms and agreements for a convenience store franchise ("Bonjour") that operated within a retail service station, and determined that it was subject to the provisions of the PMPA. *See* Civil Case No. 20-1591, Docket No. 41 at 23-26; *see*, *also*, <u>Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico), Inc.</u>, 643 F.3d 1 (1st Cir. 2011); <u>Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico), Inc.</u>, 638 F. Supp 2d 193 (D.P.R. 2009).

Defendants *Reply*, with regards to the above matter, attempts to contravene Plaintiffs' belief that the "secondary agreements" fall within the PMPA's definitions of a "franchise" and/or "franchise relationship" by asserting that the contracts covered by said statute are limited to those related to the sale, consignment or distribution of "motor fuel". *See* Civil Case No. 20-1591, Docket No. 50 at 7-9. On the other hand, Defendants contest Plaintiffs' reasoning that Act No. 60-2020 is a statue that addresses termination of franchise agreements since said Act "does not include a termination clause regarding the franchise relationship in the marketing of motor fuels. The termination of the convenience store agreement will neither physically preclude nor inhibit continued operation of the motor fuel franchise." *Id*. at 9. Also, Defendants find that Plaintiffs' arguments would render the operational dissociation in Act No. 3-1978 useless.

Plaintiffs' *Surreplies* restated arguments included in their *Oppositions*, included efforts to distinguish the various cases that Defendants referenced in support of their contentions and contained additional arguments in opposition to the new contentions that Defendants raised in their *Replies*. *See* Civil Case No. 20-1591, Dockets Nos. 59 and 70.

### C. *Arguments as to Puma's Takings Clause Claims.*

Defendants aver that Act No. 60-2020 does not constitute a regulatory taking, when the three (3) factor analysis developed by the Supreme Court for regularity takings claims is applied. *See*, *e.g.*, Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). First, as to the nature of the governmental action, Defendants believe that "it is forceful to conclude that in the balance of interest between the private property owner and the Government's need to protect the public interest through imposition of the restraint, the scale tips in favor of the Commonwealth." Civil Case No. 20-1591, Docket No. 31 at 29. Second, as to the severity of the economic impact, Defendants highlight that Act No. 60-2020 "in no way calls upon [Puma] 'to sacrifice all economically beneficial uses in the name of the common good'". *Id*. at 30 (internal citations omitted). Third, as to the degree of interference with the property owner's reasonable investment-backed expectations, Defendants find that Puma's

expectations are diminished since they are participating in a highly regulated industry and "the prospect of the legislature's continued expansion of regulating wholesalers' operations of gasoline service station were reasonably foreseeable." *Id*. at 32.

To counter Defendants' contention that Puma has no "property interests" subject to the Fifth Amendment's protection, Plaintiff asserts that Act No. 60-2020 "has deprived [them] of many of the most valuable property rights that Puma has in these properties." Civil Case No. 20-1591, Docket No. 41 at 26. Furthermore, Puma provided their take on the aforementioned three (3) factor analysis. As to the investment-backed expectations, Puma argues that they invested millions of dollars in acquiring and improving gasoline service stations "based on [their] reasonable expectation that Puma would be able to exercise operational control over other businesses conducted on these commercial properties." *Id*. at 29. Plaintiff also avers that, although the gasoline market is highly regulated, they could not have anticipated a regulation of businesses not related to the sale of gasoline; and, therefore, their investment-backed expectation had no reason to change.

With regards to the economic impact prong, Puma requests the Court to provide the Parties with the opportunity to perform discovery in order to be able to present evidence in support of this factor. Further, Plaintiff reiterates that they have "plausibly alleged that Law 60 is having and will continue to have significant economic impact on Puma." *Id*. at 30. Therefore, they offered various examples of the actions -or inactions- that retailers, tenants and or dealers are taking in attention to the passing of Act No. 60-2020, which purportedly affect the economic activities of their operations. Finally, as to the character of Act No. 60-2020, Puma alleges that "Law 60 strips away essential and fundamental property rights in some manner akin to a physical invasion." *Id*. at 32.

## I.     LEGAL STANDARD

### A.  *Motion to Dismiss*

Rule 12 (b) (6) of the Federal Rule of Civil Procedure states that "a party may assert […] [a] defense by motion [of] failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

12(b)(6). A complaint in a suit must clearly state all of the plaintiffs' claims against the defendants and specify a claim for relief stating the remedy that plaintiffs believe should be granted to them. On the other hand, Rule 8 (a) (2) of Federal Rule of Civil Procedure indicates that a claim of relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief and a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8 (a) (2). A plaintiff must, and is now required to, present allegations that "nudge [his] claims across the line from conceivable to plausible" in order to comply with the requirements of Rule 8 (a). Bell Atlantic v. Twombly, 550 U.S. 544, 548, 127 S. Ct. 1955, 1961, 167 L. Ed. 2d 929, 936 (2007); see Ashcroft v. Iqbal, 556 U.S. 662, 662, 129 S. Ct. 1937, 1939, 173 L. Ed. 2d 868 (2009). The reason for this is that the standard for a complaint was heightened in *Bell Atlantic v. Twombly*, where the Supreme Court of the United States stated that

> [w]hile a complaint attacked by a Rule 12 (b) (6) motion to dismiss does not need detailed factual allegations, ibid., a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.

Bell Atlantic, 550 U.S. at 548 (*citing* Conley v. Gibson, 355 U.S. 41, 47, 78S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

When considering a motion to dismiss, the Courts must perform a two-step process inquiry under the current context-based "plausibility" standard established by *Twombly* and *Iqbal*. "Context based" means that a plaintiff must allege sufficient facts that comply with the basic elements of the cause of action. *See* Ashcroft, 556 U.S. at 677-679 (concluding that plaintiff's complaint was factually insufficient to substantiate the required elements of a *Bivens* claim, leaving the complaint with only conclusory statements). Hence, first, the District Court must "accept as true all of the allegations contained in a complaint[,]" discarding legal conclusions, conclusory statements and factually threadbare recitals of the elements of a cause of action. *Id.* at 678. "Yet we need not accept as true legal

conclusions from the complaint or 'naked assertion[s]' devoid of 'further factual enhancement.'" Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009) (*quoting* Ashcroft, 556 U.S. at 678 and Bell Atlantic, 550 U.S. at 557).

The second step of the inquiry leads the Courts to determine whether, based upon all assertions that were not discarded under the first step of the inquiry, the complaint "states a plausible claim for relief." Ashcroft, 556 U.S. at 679. This second step is "context-specific" and requires that the Court draw from its own "judicial experience and common sense" to decide whether a plaintiff has stated a claim upon which relief may be granted, or, conversely, whether dismissal under Rule 12(b) (6) is appropriate. *Id.*

Thus "[i]n order to survive a motion to dismiss, [a] plaintiff must allege sufficient facts to show that he has a plausible entitlement to relief." Sanchez v. Pereira-Castillo, 590 F.3d 31, 41 (1st Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but has not 'show[n]' 'that the pleader is entitled to relief.'" Ashcroft, 556 U.S. at 679 (*quoting* Fed. R. Civ. P. 8 (a) (2)). Furthermore, such inferences must be at least as plausible as any "obvious alternative explanation." *Id.* at 679-80 (*citing* Bell Atlantic, 550 U.S. at 567).

The First Circuit has cautioned against equating plausibility with an analysis of the likely success on the merits, affirming that the plausibility standard assumes "pleaded facts to be true and read in a plaintiff's favor" even if seemingly incredible. Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 30 (1st Cir. 2010) (*citing* Bell Atlantic, 550 U.S. at 556); *see* Ocasio- Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (*citing* Bell Atlantic, 550 U.S. at 556) ("[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"); *see*, *also*, Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017). Instead, the First Circuit has emphasized that "[t]he make-or-break standard […] is that the combined

allegations, taken as true, must state a plausible, [but] not a merely conceivable, case for relief." Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d at 29.

However, a complaint that rests on "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" will not survive a motion to dismiss. Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996). Similarly, unadorned factual assertions as to the elements of the cause of action are inadequate as well. See Penalbert-Rosa v. Fortuno-Burset, 631 F.3d 592 (1st Cir. 2011). "Specific information, even if not in the form of admissible evidence, would likely be enough at [the motion to dismiss] stage; pure speculation is not." *Id*. at 596; *see* Ashcroft, 556 U.S. at 681. "To be clear, we do not reject […] bald allegations on the ground that they are unrealistic or nonsensical […] [i]t is the conclusory nature of [the] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." Penalbert-Rosa v. Fortuno-Burset, 631 F.3d at 595; *see* Mendez Internet Mgmt. Servs. v. Banco Santander de P.R., 621 F.3d 10, 14 (1st Cir. 2010) (The *Twombly* and *Iqbal* standards require District Courts to "screen[] out rhetoric masquerading as litigation.").

Finally, the Court notes that the First Circuit outlined two considerations for district courts to note when analyzing a motion to dismiss. *See* García-Catalán v. United States, 734 F.3d 100, 104 (1st Cir. 2013). First, a complaint modeled on Form 11 of the Appendix of the Federal Rules of Civil Procedure which contains sufficient facts to make the claim plausible is ordinarily enough to surpass the standard prescribed under *Twombly-Iqbal*. *Id*. at 104. Second, district courts should accord "some latitude in cases where "[a] material part of the information needed is likely to be within the defendant's control." *Id*. (more latitude is appropriate in cases where "it cannot reasonably be expected that the [plaintiff], without the benefit of discovery, would have any information about" the event that gave rise to the alleged injury.) (internal citations and quotations omitted).

### B. *Dormant Commerce Clause*

The Constitution provides that "Congress shall have power [...] [t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. Art. I, § 8, cl. 3. "[T]his affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." Healy v. Beer Inst., 491 U.S. 324, 326 n. 1, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989);

McBurney v. Young, 569 U.S. 221, 235, 133 S. Ct. 1709, 1719, 185 L. Ed. 2d 758 (2013) ("Our dormant Commerce Clause jurisprudence 'significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce.'" (citing Maine v. Taylor, 477 U.S. 131, 151, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)); Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28, 32–33 (1st Cir. 2007).[6] "'This 'negative' aspect of the Commerce Clause prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." Tennessee Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2459, 204 L. Ed. 2d 801 (2019)(citing New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)).[7] In other words, "the dormant Commerce Clause 'prevents state and local governments from impeding the free flow of goods from one state to another.'" Antilles Cement Corp. v. Acevedo Vila, 408 F.3d 41, 46 (1st Cir. 2005)(citing Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir.1999)).

"By prohibiting States from discriminating against or imposing excessive burdens on interstate commerce without congressional approval, it strikes at one of the chief evils that led to the adoption of

---

[6] The First Circuit has stated that "[a]lthough we rely on cases that refer to 'states,' we have held that the dormant Commerce Clause applies to Puerto Rico in the same way that it applies to states." Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez, 834 F.3d 110, 126 (1st Cir. 2016); see Walgreen Co. v. Rullan, 405 F.3d 50, 55 (1st Cir. 2005). "Like a state, therefore, Puerto Rico generally may not enact policies that discriminate against out-of-state commerce." Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 327 (1st Cir. 2012).

[7] Protectionist measures are, essentially, "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." McBurney v. Young, 569 U.S. 221, 235, 133 S. Ct. 1709, 1719–20, 185 L. Ed. 2d 758 (2013).

the Constitution, namely, state tariffs and other laws that burdened interstate commerce." Comptroller of the Treasury v. Wynne, 575 U.S. 542, 135 S.Ct. 1787, 1794, 191 L.Ed.2d 813 (2015) (citing Fulton Corp. v. Faulkner, 516 U.S. 325, 330–31, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996)). Now, "[t]his restriction on the states […] is not absolute and in the absence of conflicting legislation by Congress, 'the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected.'" Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 311 (1st Cir. 2005)(citing Maine v. Taylor, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)).

The First Circuit has explained that the inquiry required to determine whether a state law or regulation transgresses the Commerce Clause "varies depending upon the nature of the law at issue. A state statute that purports to regulate commerce occurring wholly beyond the boundaries of the enacting state outstrips the limits of the enacting state's constitutional authority and, therefore, is per se invalid.[8] A state statute […] that discriminates against interstate commerce on its face, in purpose, or in effect receives a form of strict scrutiny so rigorous that it is usually fatal. This amounts to a 'virtually per se invalid rule'". Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 35 (1st Cir. 2005)(citing Oregon Waste Systems, Inc., 511 U.S. 93, 99 (1994)); Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338, 128 S. Ct. 1801, 1808, 170 L. Ed. 2d 685 (2008)("A discriminatory law is 'virtually per se invalid'")(internal citations omitted); Philip Morris, Inc. v. Reilly, 267 F.3d 45, 62–63 (1st Cir. 2001), on reh'g en banc, 312 F.3d 24 (1st Cir. 2002).[9] "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" Id. (citing Oregon Waste Systems, Inc., 511 U.S. at 99). The Court further notes

---

[8] The Court notes that Puerto Rico Act 60-2020 does not have extraterritorial reach; therefore, the corresponding analysis for laws or regulations that produces constitutional infirmities pursuant to the commerce clause in this context is inapplicable here. See Civil Case No. 20-1591, Docket No. 31 at 18-19 (Defendants highlight this fact as part of their argumentation).

[9] "Plaintiffs bear the initial burden of showing discrimination." Fam. Winemakers of California v. Jenkins, 592 F.3d 1, 9 (1st Cir. 2010); see Cherry Hill Vineyard LLC v. Baldacci, 505 F.3d 28, 33 (1st Cir.2007).

that the discrimination should be manifested in the context of "**similarly situated** in-state and out-of-state interests." Allstate Ins. Co. v. Abbott, 495 F.3d 151, 163 (5th Cir. 2007)(emphasis provided).[10]

Aside from the scenarios where a law or regulation discriminates on its face; "'[a] finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect.'" Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d at 36 (*citing* Bacchus Imps., Ltd. v. Dias, 468 U.S. 263, 270, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984)). "Parties challenging the validity of a state statute on 'purpose' grounds must show that the statute was prompted by a discriminatory purpose." Wine and Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 12 (1st Cir. 2007); Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979).[11]

---

[10] Upon discussing "similarly situated" interests, the Supreme Court has explained that

> [c]onceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities. Although this central assumption has more often than not itself remained dormant in this Court's opinions on state discrimination subject to review under the dormant Commerce Clause, when the allegedly competing entities provide different products, as here, there is a threshold question whether the companies are indeed similarly situated for constitutional purposes. This is so for the simple reason that the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed. If in fact that should be the case, eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors.

Gen. Motors Corp. v. Tracy, 519 U.S. 278, 298–99, 117 S. Ct. 811, 824, 136 L. Ed. 2d 761 (1997).

[11] The Court notes that the Fourth and Fifth Circuits have borrowed several relevant factors from the Supreme Court ruling in *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) -which deals with identifying racial discrimination in local authorities' decisions pertaining to land classification- to perform the discriminatory analysis in the context of the dormant Commerce Clause. *See* Veasey v. Abbott, 830 F.3d 216, 231 (5th Cir. 2016); Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 336 (4th Cir.2001). Specifically, the relevant factors are:

> (1) whether a clear pattern of discrimination emerges from the effect of the state action; (2) the historical background of the decision, which may take into account any history of discrimination by the decision-making body; (3) the specific sequence of events leading up the challenged decision, including departures from normal procedures; and (4) the legislative or administrative history of the state action, including contemporary statements by decisionmakers.

Allstate Ins. Co. v. Abbott, 495 F.3d 151, 160 (5th Cir. 2007). In this context, the Fifth Circuit has further held that, "'discriminatory intent need not be proved by direct evidence' [...] [i]nstead, courts may consider both circumstantial and direct evidence of intent as may be available." Veasey v. Abbott, 830 F.3d 216 at 235 (*citing* Rogers v. Lodge, 458 U.S. 613, 618, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982)).

The First Circuit has clarified that "[t]he purpose of a statute, like its meaning, must be discerned from the statute as a whole. Thus, context is a critically important interpretive tool." All. of Auto. Mfrs. v. Gwadosky, 430 F.3d at 37; *see* Edwards v. Aguillard, 482 U.S. 578, 594, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose").[12] On the other hand, "[a] state law is discriminatory in effect when, in practice, it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests." Fam. Winemakers of California v. Jenkins, 592 F.3d 1, 10 (1st Cir. 2010).[13]

If discrimination against commerce is demonstrated, a discriminatory law can survive -only- if it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternative". Oregon Waste Systems, 511 U.S. at 101 (internal quotation marks omitted); Tennessee Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2461, 204 L. Ed. 2d 801 (2019)(*citing* Department of Revenue of Ky. v. Davis, 553 U.S. 328, 338, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008))("Under our dormant Commerce Clause cases, if a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to 'advanc[e] a legitimate local purpose'"). Conversely, "[a] state statute that 'regulates evenhandedly and has only incidental effects on interstate commerce' engenders a lower level of scrutiny." Alliance of Auto. Mfrs., 430 F.3d at 35.[14] In said instances, "[w]here the statute

---

[12] In *Family Winemakers of California v. Jenkins* the First Circuit added that, in reviewing the "statute as a whole", the analysis includes the examination of "statutory text, context, and legislative history, but we also consider whether the statute was "closely tailored to achieve the legislative purpose" the state asserted." Fam. Winemakers of California v. Jenkins, 592 F.3d 1, 13 (1st Cir. 2010)(internal citations omitted).

[13] The First Circuit highlighted that "[t]he Supreme Court has not directly spoken to the question of what showing is required to prove discriminatory effect where, as here, a statute is evenhanded on its face and wholesome in its purpose. In our view, that showing must be substantial." Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28, 36 (1st Cir. 2007).

[14] "The state bears the burden of showing legitimate local purposes and the lack of non-discriminatory alternatives, and discriminatory state laws rarely satisfy this exacting standard." Fam. Winemakers of California v. Jenkins, 592 F.3d 1, 9 (1st Cir. 2010).

regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. at 142.[15] The First Circuit further explained that said test has three steps, which include the following: "[f]irst, we are to evaluate the nature of the putative local benefits advanced by the statute. Second, we must examine the burden the statute places on interstate commerce. Finally, we are to consider whether the burden is 'clearly excessive' as compared to the putative local benefits." Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d at 312.

### C. Preemption[16]

The Supremacy Clause states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land" U.S. Const. Art. VI, cl. 2. Consequently, "[a]ny state law that contravenes a federal law is null and void." Tobin v. Fed. Exp. Corp., 775 F.3d 448, 452 (1st Cir.2014). Further, the Supremacy Clause "gives Congress 'the power to preempt state law,' which Congress may exercise either expressly or impliedly." Capron v. Off. of Att'y Gen. of Massachusetts, 944 F.3d 9, 21 (1st Cir. 2019), cert. denied sub nom. Capron v. Off. of the Att'y Gen. of Massachusetts, 141 S. Ct. 150, 207 L. Ed. 2d 1089 (2020) (citing Arizona v. United States, 567 U.S. 387, 399, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012)).

Pursuant to the above, federal laws may preempt state laws in two ways; that is, through "express preemption" or "implied preemption".[17] "Express preemption occurs only when a federal

---

[15] That is, "[u]nder that test—to be used when the state statute at issue regulates evenhandedly and has only incidental effects on interstate commerce—courts employ a balancing approach whereby they examine whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 312 (1st Cir. 2005).

[16] "The burden to prove preemption is on the plaintiffs." Capron v. Off. of Att'y Gen. of Massachusetts, 944 F.3d 9, 21 (1st Cir. 2019), cert. denied sub nom. Capron v. Off. of the Att'y Gen. of Massachusetts, 141 S. Ct. 150, 207 L. Ed. 2d 1089 (2020); see United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 9 (1st Cir. 2005).

[17] The "Courts consider Congress' intent in passing the federal law when determining if it preempts a state law." Assured Guar. Corp. v. Garcia-Padilla, 214 F. Supp. 3d 117, 125 (D.P.R. 2016); see Antilles Cement Corp. v. Fortuño,

statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion." Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 15 (1st Cir. 2000); Jones v. Rath Packing Co., 430 U.S. 519, 538 (1977).[18] In said scenario, if the statute "contains an express pre-emption clause, [courts] do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress'[s] pre-emptive intent.'" Puerto Rico v. Franklin Cal. Tax-Free Tr., --- U.S. ----, 136 S. Ct. 1938, 1946 (2016).

On the other hand, "in the absence of an express preemption provision, courts look to 'the structure and purpose of the statute' to determine whether Congress intended preemption to occur." AES Puerto Rico, L.P. v. Trujillo-Panisse, 133 F. Supp. 3d 409, 420 (D.P.R. 2015)(citing Antilles, 670 F.3d at 323); see Kansas v. Garcia, 140 S. Ct. 791, 801, 206 L. Ed. 2d 146 (2020).[19] Now, "implied preemption" has been divided into two categories: first, "field preemption" and, second, "conflict preemption". See Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d at 15.[20] Under "field preemption", "a state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990). This "can be inferred from a framework of regulation 'so pervasive ... that Congress

---

670 F.3d 310, 323 (1st Cir.2012). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

[18] "The existence of this express preemption clause 'does not immediately end the inquiry,' however, because the Court must still ascertain 'the substance and scope of Congress' displacement of state law.'" Franklin California Tax-Free Tr. v. Puerto Rico, 85 F. Supp. 3d 577, 596 (D.P.R. 2015)(citing Altria Grp., Inc. v. Good, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008); Mass. Ass'n of Health Maint. Orgs. v. Ruthardt, 194 F.3d 176, 179 (1st Cir. 1999)("[A]lthough an express preemption clause may indicate congressional intent to preempt 'at least some state law,' courts nonetheless must 'identify the domain expressly pre-empted by that language.'") (internal citations omitted). "'Congressional intent is the principal resource to be used in defining the scope and extent of an express preemption clause,' and courts look to the clause's 'text and context' as well as its 'purpose and history' in this endeavor." Id. (citing Brown v. United Airlines, Inc., 720 F.3d 60, 63 (1st Cir.2013)).

[19] "More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the Federal statutes 'structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent." Barnett Bank of Marion Cty., N.A. v. Nelson, 517 U.S. 25, 31 (1996) (internal citations omitted).

[20] "This argument, like all preemption arguments, must be grounded 'in the text and structure of the statute at issue.'" Kansas v. Garcia, 140 S. Ct. 791, 804, 206 L. Ed. 2d 146 (2020)(citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)).

left no room for the States to supplement it' or where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *see* <u>Arizona</u>, 567 U.S. at 399. In turn, under "conflict preemption", "state law is ... pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Fitzgerald v. Harris</u>, 549 F.3d 46, 53 (1st Cir. 2008) (*quoting* <u>Good v. Altria Group, Inc.</u>, 501 F.3d 29, 47 (1st Cir. 2007)); s*ee* <u>Telecomm. Regulatory Bd. of P.R. v. CTIA–Wireless Ass'n</u>, 752 F.3d 60, 64 (1st Cir.2014).[21]

Finally, the Court notes that preemption is a "strong medicine", that is "not casually to be dispensed." <u>Grant's Dairy</u>, 232 F.3d at 18. This principle is applied considering that "[t]he preemption of state laws represents 'a serious intrusion into state sovereignty' […] And to order preemption based not on the strength of a clear congressional command, or even on the strength of a judicial gloss requiring that much of us, but based only on a doubtful extension of a questionable judicial gloss would represent not only a significant federal intrusion into state sovereignty. It would also represent a significant judicial intrusion into Congress's authority to delimit the preemptive effect of its laws." <u>Virginia Uranium, Inc. v. Warren</u>, --- U.S. ----,139 S. Ct. 1894, 1904, 204 L. Ed. 2d 377 (2019)(*citing* <u>Medtronic, Inc. v. Lohr</u>, 518 U. S. 470, 488, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)); <u>Maryland v. Louisiana</u>, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law.") Hence, "'[w]hen the text of a preemption clause is susceptible of more than one plausible

---

[21] The "conflict preemption" analysis "must be applied sensitively [...] so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role." <u>Nw. Cent. Pipeline Corp. v. State Corp. Com'n of Kan.</u>, 489 U.S. 493, 515 (1989). It's worth noting that the Supreme Court has established "that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." <u>Chamber of Commerce of U.S.A. v. Whiting</u>, 563 U.S. 582, 607 (2011)(internal citations omitted).

reading, courts ordinarily 'accept the reading that disfavors preemption.'" Altria Grp., Inc. v. Good, 555 U.S. 70, 77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (*quoting* Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005)). Therefore, a presumption against preemption should apply, particularly in cases where Congress has legislated in a field which the states have previously occupied. *See* Wyeth v. Levine, 555 U.S. 555, 565 n. 3, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009); Grant's Dairy, 232 F.3d at 18 (In said instances courts "start with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress"); AES Puerto Rico, L.P. v. Trujillo-Panisse, 133 F. Supp. 3d at 420-21. Finally, the contrary is also true, said presumption against preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000).

### D.  A Brief Note on Statute Interpretation

The Court notes that "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose". Gross v. FBL Financial Services, Inc., 557 U.S. 167, 175, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009); *see* Schindler Elevator Corp. v. U.S. ex rel. Kirk, 563 U.S. 401, 407, 131 S. Ct. 1885, 1891, 179 L. Ed. 2d 825 (2011); Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning"). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). "In interpreting the statute at issue, we consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme." Holloway v. United States, 526 U.S. 1, 6, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999) (internal citations omitted).

### E.  The Petroleum Marketing Practices Act (PMPA)

This case involves the regulation of the relationship between gasoline wholesalers and retailers.

As to the gasoline industry, the Supreme Court has explained that

> Petroleum refiners and distributors supply motor fuel to the public through service stations that often are operated by independent franchisees. In the typical franchise arrangement, the franchisor leases the service-station premises to the franchisee, grants the franchisee the right to use the franchisor's trademark, and agrees to sell motor fuel to the franchisee for resale. Franchise agreements remain in effect for a stated term, after which the parties can opt to renew the franchise relationship by executing a new agreement.

Mac's Shell Serv., Inc. v. Shell Oil Prod. Co. LLC, 559 U.S. 175, 178, 130 S. Ct. 1251, 1255, 176 L. Ed. 2d 36 (2010). In this context, Congress enacted the PMPA which "is a conventional dealer-protection statute limiting the circumstances in which a motor fuel franchisor can terminate or choose not to renew a franchise relationship." Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico), 643 F.3d 1, 4 (1st Cir. 2011); see Esso Standard Oil Co. v. Dep't of Consumer Affs., 793 F.2d 431, 432 (1st Cir. 1986)(The PMPA "was enacted by Congress in 1978 to protect gasoline franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises."); Mac's Shell Serv., Inc. v. Shell Oil Prod. Co. LLC, 559 U.S. at 178 ("Enacted in 1978, the PMPA was a response to widespread concern over increasing numbers of allegedly unfair franchise terminations and nonrenewals in the petroleum industry.").[22] Therefore, at its core, the PMPA addresses "the disparity of bargaining power existing between franchisors and franchisees sometimes resulted in franchise agreements that amounted to contracts of adhesion." Id.[23]

---

[22] The PMPA is divided into three subchapters; that is: Subchapter I which "governs franchise arrangements for the sale, consignment, or distribution of motor fuel"; Subchapter II which addresses the testing, certification, labeling and disclosure of a gasoline's octane rating; and Subchapter III which deals with the subsidization of moto fuel marketing. C.K. Smith & Co. v. Motiva Enterprises LLC., 269 F.3d 70, 73–74 (1st Cir. 2001).

[23] "Despite the protection offered to franchisees, the PMPA was also enacted to provide 'adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.'" BP W. Coast Prod. LLC v. May, 447 F.3d 658, 662 (9th Cir. 2006)(citing Unocal Corp. v. Kaabipour, 177 F.3d 755, 762 (9th Cir.1999).

In order to carry out its purpose, "the PMPA establishes minimum standards designed to prevent arbitrary or discriminatory discontinuance of franchise agreements." C.K. Smith & Co. v. Motiva Enterprises LLC., 269 F.3d 70, 73-74 (1st Cir. 2001).[24] Therefore, "[t]erminating or failing to renew a franchise is only permitted for one of the PMPA's enumerated reasons, and subject to proper advance notice." Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico), 860 F. Supp. 2d 131, 140 (D.P.R. 2012); see C.K. Smith & Co. v. Motiva Ents. LLC, 269 F.3d 70, 74 (1st Cir. 2001). To that end, "a franchisor may terminate the relationship on any of five specified grounds, 15 U.S.C. § 2802(a), (b)(2)(A)-(E)". Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico), 643 F.3d at 4. Furthermore, "[t]o enforce these provisions, a franchisee may bring suit in federal court against any franchisor that fails to comply with the Act's restrictions on terminations and nonrenewals […] The Act also requires district courts to grant preliminary injunctive relief to aggrieved franchisees, if there are 'sufficiently serious questions going to the merits' that present 'a fair ground for litigation' and the

---

[24] "[I]t should be understood that the PMPA makes a distinction between a 'franchise' and a 'franchise relationship'". C.K. Smith & Co. v. Motiva Enterprises LLC., 269 F.3d at 74. "The term 'franchise' covers the essential contracts between a retailer and a supplier (e.g., lease of retail premises, provision of motor fuel, use of the supplier's trademark in connection with retail sales)." Id. specifically, the PMPA states that the term "franchise" includes:

> (i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;
> (ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed-
> -
> (I) under a trademark owned or controlled by a refiner; or
> (II) under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and
> (iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

15 U.S.C.A. § 2801. On the other hand, the term "'franchise relationship' means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise". Id. The First Circuit explained that "Congress created the legal rubric of a franchise relationship to preclude oil companies from asserting that because a franchise no longer exists after it expires, there is nothing left to renew." C.K. Smith & Co. v. Motiva Enterprises LLC., 269 F.3d at 74.

balance of hardships favors such relief." <u>Mac's Shell Serv., Inc. v. Shell Oil Prod. Co. LLC</u>, 559 U.S. at 179 (internal citations omitted).

On the other hand, the PMPA contains a "broad preemption against state and local laws and regulations addressing any acts or omissions covered by the PMPA". <u>Alvarez v. Chevron Corp.</u>, 656 F.3d 925, 934 (9th Cir. 2011). Therefore, Section 2806 states that "[t]o the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, [...] no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise [...] unless such provision of such law or regulation is the same as the applicable provision of this subchapter." 15 U.S.C.A. § 2806. This preemption effect applies "only [to] those state or local laws that govern the termination of petroleum franchises or the nonrenewal of petroleum franchise relationships." <u>Mac's Shell Serv.</u>, 599 U.S. at 188. Further, the preemption applies, "unless such provision of such law or regulation is the same as the applicable provision of this subchapter." 15 U.S.C. § 2824(a). Finally, the Court notes that "through its express preemption provision, Congress indicated that it did not intend 'to preempt all state provisions involving the substantive aspects of petroleum-products franchises.'" <u>Esso Standard Oil Co. v. Dep't of Consumer Affs.</u>, 793 F.2d at 434 (internal citations omitted).

Various Circuit Courts have tackled the issue of preemption in the context of the PMPA. The Third Circuit has stated that the "PMPA only preempts state laws that limit the permissible substantive reasons that a petroleum franchisor can terminate a franchisee" because "[t]he goal of the framers of the PMPA was to create a uniform system of franchise termination, not a uniform system of contract law". <u>O'Shea v. Amoco Oil Co.</u>, 886 F.2d 584, 592-593 (3d Cir.1989); <u>Continental Enterprises, Inc. v. American Oil Co.</u>, 808 F.2d 24, 27 (8th Cir. 1986)(Congress "clearly intended to provide uniform minimum standards for the termination and nonrenewal of franchises and to bar state regulation of this

area"); <u>Petroleum Co. v. Texaco, Inc.</u>, 804 F.2d 907, 915 (6th Cir.1986); <u>Bellmore v. Mobil Oil Corp.</u>, 783 F.2d 300, 304 (2d Cir.1986). Taking to account said reasoning in mind, several Circuit Courts have employed an "intimately intertwined test" to determine whether a state or regulation are preempted. Hence, "[i]n short, when state law claims are 'intimately intertwined' with the termination or nonrenewal of a franchise they are preempted by the PMPA.'" <u>Kehm Oil Co. v. Texaco, Inc.</u>, 537 F.3d 290, 299 (3d Cir. 2008); <u>Shukla v. BP Exploration & Oil, Inc.</u>, 115 F.3d 849 (11th Cir.1997).

### F. *Takings Clause*[25]

The Fifth Amendment of the United States provides, in its relevant part, that "**private property [shall not] be taken for public use, without just compensation**." U.S. Const. amend. V (emphasis provided); *see* <u>Cedar Point Nursery v. Hassid</u>, --- U.S. ----,141 S. Ct. 2063, 2071 (2021); <u>Lingle v. Chevron U.S.A. Inc.</u>, 544 U.S. 528, 536, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). Consequently, "[t]he Takings Clause sets two conditions on the government's constitutional authority to take private property: the government may take private property for "public use," but it must provide just compensation when it does so." <u>Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno</u>, 604 F.3d 7, 12 (1st Cir. 2010).

It is critical to consider that the Takings Clause's "prohibition extends not only to the paradigmatic physical taking—i.e., where the government condemns or physically appropriates a person's property—but also to regulatory interferences, which transpire 'when some significant restriction is placed upon an owner's use of his property for which 'justice and fairness' require that compensation be given.'" <u>Maine Educ. Ass'n Benefits Tr. v. Cioppa</u>, 695 F.3d 145, 152 (1st Cir. 2012)(*citing* <u>Philip Morris, Inc. v. Reilly</u>, 312 F.3d 24, 33 (1st Cir. 2002)). The regulatory takings follow the proposition that "while property may be regulated to a certain extent, if regulation goes too

---

[25] "The Takings Clause of the Fifth Amendment applies to the states and to Puerto Rico through the Fourteenth Amendment." <u>Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno</u>, 604 F.3d 7, 12 (1st Cir. 2010).

far it will be recognized as a taking." <u>Cedar Point Nursery v. Hassid</u>, 141 S. Ct. at 2072 (internal citations omitted).

Further, "[t]he dichotomy between physical and regulatory takings is critical, for it often determines the level of scrutiny that a challenged government action will receive." <u>Maine Educ. Ass'n Benefits Tr. v. Cioppa</u>, 695 F.3d at 153; <u>Cedar Point Nursery v. Hassid</u>, 141 S. Ct. at 2071 ("When the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property, a different standard applies"). Therefore, "[i]n contrast to the law of physical takings, which typically 'involves the straightforward application of *per se* rules,' regulatory takings jurisprudence [...] is characterized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all the relevant circumstances'". <u>Franklin Mem'l Hosp. v. Harvey</u>, 575 F.3d 121, 125 (1st Cir. 2009)(internal citations omitted).[26] Considering that Act No. 60-2020 does not involve the physical taking of property, rather the Act restricts the property owner's ability to use his own property, Plaintiffs' allegations must be examined under the context of regulatory takings claims.

Consequently, "[t]o assess the propriety of a regulatory takings claim, the Court has instead enumerated a more nuanced, three-pronged inquiry into (1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; (2) the regulation's economic impact on the property owner; and (3) the character of the government action." <u>Maine Educ. Ass'n Benefits Tr. v. Cioppa</u>, 695 F.3d at 153; *see* <u>Penn Cent. Transp. Co. v. City of New York</u>, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).[27] The First Circuit has further clarified that the above factors

---

[26] The Court notes that applying a *per se* rule to a physical taking means that "'[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner.'" <u>Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza</u>, 484 F.3d 1, 28 (1st Cir. 2007)(*citing* <u>Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency</u>, 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)).

[27] The First Circuit has noted that "'the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.' Ultimately, this inquiry 'aims to identify regulatory actions that are functionally equivalent to the

"operate not as a 'checklist of items that can be ticked off as fulfilled or unfulfilled,' but rather as 'lenses through which a court can view and process the facts of a given case.'" Maine Educ. Ass'n Benefits Tr. v. Cioppa, 695 F.3d at 153 (citing Philip Morris, Inc. v. Reilly, 159 F.3d at 674). Finally, the Court notes that there are two circumstances where a regulatory action should not be evaluated under the referenced factors, but pursuant to *per se* rules; that is: (1) "where a regulation inflicts a permanent physical invasion of private property—however minor—the government must provide just compensation" and (2) where a regulation "'completely deprive an owner of all economically beneficial use of her property.'" *Id*. (citing Lingle, 544 U.S. at 538, 125 S.Ct. 2074).[28]

## III.    ANALYSIS

### A.   *Puma's Commerce Clause Claims*

As previously noted above, Puma's *Complaint* alleges that Act No. 60-2020 was enacted with a discriminatory purpose and, alternatively or jointly, that the Act is discriminatory in effect.[29] To support their discriminatory purpose claim, Puma -essentially- contends that comments made by the Act's sponsor, and other comments provided by the Act's supporters outside of the Senate floor, reveal the protectionist purpose of the law.[30] *See, e.g.*, Civil Case No. 20-1591, Docket No. 1 at ¶¶ 3, 46, 50,

---

classic taking in which the government directly appropriates private property or ousts the owner from his domain.'" Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 127 (1st Cir. 2009)(internal citations omitted).

[28] These situations have been "deemed *per se* takings". Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 125 (1st Cir. 2009)(citing Lingle, 544 U.S. at 538, 125 S.Ct. 2074).

[29] The Court notes that a cursory review of the text of Act No. 60-2020 reveals that there is no discrimination from its face; that is, the Court does not find that the Act contains a differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. Therefore, Puma's must be examined under the scope of discriminatory purpose or effect.

[30] As to these arguments, the Court takes the opportunity to provide a few words of caution by way of prior First Circuit expressions: "[w]hile statements by a law's private-sector proponents sometimes can shed light on its purpose, the correspondence of a single lobbyist has little (if any) probative value in demonstrating the objectives of the legislative body as a whole. This is particularly so when, as in this case, far stronger statements of intent can be gleaned from official legislative sources." All. of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 39 (1st Cir. 2005); *see, also*, Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (eschewing reliance on the comments of a single legislator and emphasizing that "the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill"); *United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (footnote omitted)("Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said

51. Defendants' counter arguments suggest that the Court will find in the Act's text and the official Senate's Committee Reports no discriminatory purpose that guided the enactment of the legislation. After considering both Parties' positions, the Court finds that the allegations contained in Puma's *Complaint* as to this claim are plausible and, therefore, pass the standard set by Rule 12 (b)(6) of the Federal Rules of Civil Procedure.[31] The expressions that Senator Rios made in the Senate floor seem to support Plaintiffs' theory; however, it is well known that these expressions are not enough by themselves to prove discriminatory purpose. *See*, *e.g.*, Veasey v. Abbott, 830 F.3d 216, 231 (5th Cir. 2016)("Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that disparate impact.")(*referencing* Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Therefore, although Plaintiffs' allegations make their claim plausible, the Court needs to consider further evidence in order to ascertain whether Act No. 60-2020 was enacted with a discriminatory purpose. *See* All. of Auto. Mfrs. v. Gwadosky, 430 F.3d at 37 ("The purpose of a statute, like its meaning, must be discerned from the statute as a whole. Thus, context is a critically important interpretive tool"); Veasey v. Abbott, 830 F.3d 216, 233 (5th Cir. 2016)("Discerning the intent of a decisionmaking body is difficult and problematic. To aid in this task, courts may evaluate 'contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action […]'")(internal citations omitted). Consequently, dismissal of this claim is unwarranted at this stage of the proceedings.

---

about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.").

[31] Further, the Court recognizes that "[i]t is not the place of this court, however, to pass judgment on the wisdom of the policies adopted by the […] legislature." Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d at 312–13; *see* Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 124, 98 S. Ct. 2207, 2213, 57 L. Ed. 2d 91 (1978)("The evidence presented by the refiners may cast some doubt on the wisdom of the statute, but it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary 'to sit as a 'superlegislature to weigh the wisdom of legislation'")(internal citations omitted).

Similarly, Puma alleged that Act No. 60-2020 was discriminatory in its effect since the Act excludes Plaintiffs from participating in the other business established with regards to the gasoline service station operations. In support of said theory, Puma sustains that they are "off-island wholesalers" which are "similarly situated" to the other entities or individuals that participate in these businesses. Defendants' opposition highlights the fact that Puma is a registered corporation under the laws of the Commonwealth of Puerto Rico and, therefore, they "cannot raise an interstate commerce claim arguing that Act No. 60-2020 was discriminatory to out-of state wholesalers because if favoritism existed it could have not suffered any harm as a result of it." Civil Case No. 20-1591, Docket No. 31 at 19.[32] Further, Defendants find that as a gasoline "wholesaler", Puma cannot be "similarly situated" when effectuating this examination.

Thankfully for Plaintiffs, the standard in questions is "plausibility" and not "probability". Although the Court holds some doubts as to Puma's ability to advance this theory beyond discovery, the Court considers that their allegations meet the plausibility standard under Rule 12 (b)(6). Finally, as previously explained, even if the Court were to find that Act No. 60-2020 was enacted with discriminatory intent or produces a discriminatory effect, the analysis then shifts to determining whether said state legislation "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternative". Oregon Waste Systems, 511 U.S. at 101 (internal quotation marks omitted). This examination cannot be performed at this stage; therefore, the Parties must be afforded the opportunity to engage in discovery to find the necessary evidence to support their contentions.[33]

---

[32] Puma references the First Circuit's decision in *Wallgreen Co. v. Rulla*n, 405 F.3d 50 (2005), for the proposition that "a law's discrimination need not be perfect in order to show discriminatory effect". *See* Walgreen Co. v. Rullan, 405 F.3d 50, 58 (1st Cir. 2005)("Our conclusion is also unaffected by the fact that a few of the existing pharmacies when the Act was passed (and now) are owned by out-of-Commonwealth interests. Holding otherwise would be tantamount to saying that a favored group must be *entirely* in-state for a law to have a discriminatory effect on commerce. The Secretary cites no authority for this proposition, and our precedent suggests otherwise.")

[33] The Court highlights that "[w]hile these rules are easy to recite, their application to a particular factual setting is often difficult. Recognizing this difficulty, the Supreme Court has cautioned that the dormant Commerce Clause inquiry should be undertaken by 'eschew[ing] formalism for a sensitive, case-by-case

### B. *Plaintiffs' Preemption Claims*

Plaintiffs' essential contention as to this matter is that Act No. 60-2020, in its application,[34] limits "the PMPA-sanctioned circumstances under which a franchisor may terminate or not renew a franchise agreement". Civil Case No. 20-1591, Docket No. 58 at 7. In order for this reasoning to hold water, Plaintiffs depend on the assertion that the "secondary agreements" they have executed (which include the establishment of convenience stores, carwashes, oil change stations, light mechanic ships, etc.) are part of the "franchise" or "franchise relationship" covered by the PMPA. Although the Court finds that this is ultimately a matter of law, a factual basis is needed to responsibly perform the corresponding analysis. That is, at this stage, the Court has not examined the "franchise agreements" nor the "secondary agreements" that Plaintiffs allege fall under the "franchise" or "franchise relationship" covered by the PMPA; consequently, the Court cannot determine whether these "secondary agreements" fall within the scope of the federal legislation.

Should Plaintiffs' argument as to the nature of the "secondary agreements" were to be deemed as correct, Act No. 60-2020, by limiting Plaintiffs' exercise of control over said "secondary agreements", could potentially affect their ability to terminate and/or renew their "franchises" under the PMPA and, therefore, we could be under an issue of preemption. Taking this into account, under the standards set by Rule 12 (b)(6) of the Federal Rules of Civil Procedure, Plaintiffs' claims are plausible.[35]

---

analysis of purposes and effects.'" Walgreen Co. v. Rullan, 405 F.3d 50, 55 (1st Cir. 2005)(*citing* West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 201 (1994)).

[34] A cursory reading of Act No. 60-2020 shows that said state legislation does not expressly regulate the termination and renewal of franchise agreements. This fact certainly casts a shadow over Plaintiffs' contention since "Congress did make clear that, save where PMPA regulates termination and renewal and so bars inconsistent state law, state law is not superseded, 15 U.S.C. § 2806(a) […]" Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico), 643 F.3d 1, 7 (1st Cir. 2011).

[35] Defendants highlight that the First Circuit in *Esso Standard Oil Co. v. Dep't of Consumer Affs.*, 793 F.2d 431 (1st Cir. 1986) determined that Congress, through the PMPA, "'did not intend to preempt all state provisions involving the substantive aspects of petroleum-products franchises.'" Civil Case No. 20-1591, Docket No. 64 at 3. The Court agrees; however, the issue here might just be whether Act No. 60-2020's broad limitation on the operation of other business related to the operation of the gasoline station goes as far as to affect the rights conferred by the PMPA and ultimately enter in conflict with the federal legislation's express preemption.

Finally, a word of caution, this determination to continue forward does not imply that the Court agrees with Plaintiffs' reading of the PMPA and the non-binding precedents cited in support of their contention. The Court finds that Defendants posited various convincing arguments as to the narrow reading of the terms "franchise" and "franchise relationship" in the context of the sale, consignment or distribution of motor fuel, that will be afforded serious consideration from the Court when the time comes. Further, the fact that Act No. 60-2020 does not expressly regulate the circumstances in which franchisors may terminate a franchise or decline to renew a franchise relationship must be afforded considerable weight.

### C. *Puma's Takings Clause Claims*

Puma alleges that Act No. 60-2020 constitutes a regulatory taking of their property and that they will be able to prove it by satisfying the three (3) prong test articulated by the Supreme Court in *Penn Cent. Transp. Co. v. City of New York*. Hence, first, Puma highlighted the alleged investments made with regards to the gasoline service stations and the business associated with said operations. *See* Civil Case No. 20-1592, Docket No. 1 at ¶¶ 1, 7, 69-76. Second, Plaintiff made allegations as to the impact that Act No. 60-2020 is having or will have on said business and the general operations of the retail gas stations. *Id*. at ¶¶ 76 (a)-76(d). Third, Puma construes the provisions of Act No. 60-2020 as that of a regulatory taking. *Id*. at ¶ 69. On the other hand, Defendants advance their own view of the *Penn Cent.* factors. To that end, they justify the character of Act No. 60-2020, challenge the purported economic impact of the Act by advancing the theory that Puma will not be left without all economically beneficial uses of their lands or rights and Defendants further contend that by operating in a highly regulated industry, Puma should have adjusted the investment expectations accordingly.

Considering the Parties contentions, the Court also finds that Puma managed to present a plausible regulatory taking claim pursuant to the Fifth Amendment, under the standard of Rule 12(b)(6) of the Federal Rules of Civil Procedure. Taking Plaintiffs' allegations as true, the Court finds that it may be inferred at this stage that their investment backed expectations were reasonable and, although

the gasoline industry may be highly regulated, the effects of Act No. 60-2020 may not be as foreseeable as the Government paints them to be. Further, although from its face Act No. 60-2020 is not discriminatory, as discussed above, the Court concluded that -at this stage- a claim of discriminatory purpose or effect is plausible; therefore, making a determination as to the Act's character for purposes of this analysis is premature. Finally, the Court believes that, considering the alleged facts of the instant case, in order to perform the *Penn Cent* analysis, the Court will need to delve into the evidence to be provided by the Parties; therefore, dismissal of this claim at this stage is not warranted.

### IV.   CONCLUSION

Taking into account the analysis above, the Court hereby **GRANTS IN PART AND DENIES IN PART** Defendants' *Motions to Dismiss* filed in Civil Case No. 20-1591. To that end, the Court will move the instant proceedings forward with Counts I, II and III of Puma's *Complaint* filed at Civil Case No. Civil Case No. 20-1591 and Counts I and II of Total's *Complain* filed at Civil Case No. 20-1725.[36] On the other hand, as stated in note 3 of the instant *Opinion and Order*, Count IV of Puma's *Complaint* is hereby **DISMISSED WITH PREJUDICE**; however, the Court notes that it will refrain from issuing a partial judgment as to Count IV of Puma's *Complaint* at this time. The First Circuit strongly disfavors partial judgments as they foster piecemeal appeals. *See* Nichols v. Cadle Co., 101 F.3d 1448, 1449 (1st Cir. 1996)("piecemeal appellate review invites mischief. Because the practice poses a host of potential problems we have warned, time and again, that Rule 54(b) should be used sparingly."); Zayas-Green v. Casaine, 906 F.2d 18, 21 (1st Cir. 1990)("This final judgment rule [. . .] furthers 'the strong congressional policy against piecemeal review.'" *Id.* (quoting In re Continental Investment Corp., 637 F.2d 1, 3 (1st Cir. 1980)); Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct and

---

[36] The Court notes that Defendants requested the dismissal of Puma's claims under the Commonwealth Constitution, for the same reasons it advanced as to the claims articulated under the United States' Constitution. *See* Civil Case No. 20-1591, Docket No. 31 at 33. However, because the Court hereby finds Puma's claims in Counts No. I, II and III of the *Complaint* are plausible, and no additional or particular arguments were made as to Plaintiffs' state Constitution claims, Defendants' request for dismissal of these claims is also **DENIED**.

Sewer Authority, 888 F.2d 180, 183 (1st Cir. 1989); Consolidated Rail Corp v. Fore River Ry. Co., 861 F.2d 322, 325 (1st Cir. 1988); Spiegel v. Trustees of Tufts Coll., 843 F.2d 38, 43 (1st Cir. 1988); Santa Maria v. Owens-Ill., Inc., 808 F.2d 848, 854 (1st Cir. 1986)); *see also* United States v. Nixon, 418 U.S. 683, 690 (1974). On the other hand, the Court hereby **DENIES** Defendants' *Motion to Dismiss* filed in Civil Case No. 20-1725.

Further, the Court hereby orders Defendants to file their responsive pleadings to both, Puma and Total's *Complaints*, **on or before October 12, 2021**. Finally, the Court notes that after the answers to the *Complaints* are dully filed, a *Scheduling Order* will be entered in order to set the corresponding *Initial Scheduling Conference*.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this September 22, 2021.

*S/ Daniel R. Dominguez*
DANIEL R. DOMINGUEZ
U.S. DISTRICT JUDGE