THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

PUERTO RICO ENERGY, LLC,

    Plaintiff,

     v.

COMMONWEALTH OF PUERTO RICO, et al.,

    Defendant.

**Civil No. 20-1591 (ADC)**

-----------------------------------------------------------

TOTALENERGIES MARKETING PUERTO RICO, CORP.,

    Plaintiff,

     v.

**Civil No. 20-1725(ADC)**

THE COMMONWEALTH OF PUERTO RICO, et al.,

    Defendant

## OPINION AND ORDER

Motor fuel[1] in Puerto Rico is supplied to the public through retail service stations. These stations are operated by independent franchisees under petroleum franchise agreements under

---

[1] Pursuant to PMPA, *infra*, motor fuel "means gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads, and highways."15 U.S.C. § 2801(1)(B)(12). For purposes of discussion, the Court will use the terms motor fuel or petroleum interchangeably.

which the franchisor leases the station premises to the franchisee, grants the franchisee the right to use the franchisor's trademark, and agrees to sell motor fuel to the franchisee for resale. Aside from these core[2] agreements, the parties executed several other agreements related to non-motor fuel business. These secondary contracts include agreements for the operation of a "convenience store" and other offerings at the gas stations.[3] Puerto Rico Energy, LLC ("PRE") and TotalEnergies Marketing Puerto Rico, LLC ("TEMPR" and together with PRE, "plaintiffs") challenge 2020 amendments to a local motor fuel anti monopolistic statute as preempted by the Petroleum Marketing Practices Act.

Pending before the Court are the US Magistrate Judge Giselle López-Soler's ("Magistrate Judge") Report and Recommendation ("R&R"), **ECF No. 304**, and objections filed by the Puerto Rico Gasoline Retailers Association, Inc. ("PRGRA"),[4] **ECF No. 311**, and the Commonwealth of Puerto Rico, the Governor of Puerto Rico, the Secretary of Justice, the Deputy Secretary of Antitrust Affairs, and the Secretary of the Department of Consumer Affairs' ("Commonwealth defendants" and together with PRGRA, "defendants"), **ECF No. 318**. The R&R recommends that the Court deem defendants' motion for summary judgment at **ECF No. 206** moot in part and

---

[2] *See Metrol, Inc. v. ExxonMobil Oil Corp.*, 672 F.3d 1108, 1115 (D.C. Cir. 2012) (describing "use of the trademark, supplying fuel, and authorizing use of the station… [as] the three statutory pillars of a franchise relationship.").

[3] Plaintiffs generally allude to other non-petroleum secondary agreements containing the terms and conditions for the credit card point-of-sale systems, liquid propane gas program, vehicle accessories, refreshments, cigarettes, lottery, and others. For sake of simplicity, the Court will make general reference to those secondary agreements as the "convenience store" agreements.

[4] The Court will consider intervenor PRGRA as a defendant for purposes of this Opinion and Order.

denied in part, and that PRE's and TEMPR's cross-motions for summary judgment at **ECF Nos. 221** and **245** be granted.

For the reasons stated herein, the Court **SUSTAINS** the Objections at **ECF Nos. 311**, **318**, and **REJECTS** the R&R at **ECF No. 304**. Thus, the motions for summary judgment at **ECF No. 206, 210** are **GRANTED;** the cross-motions for summary judgment filed by plaintiffs at **ECF Nos. 221, 236,** and **245** are **DENIED**.

## I.    Procedural background

### A.    The Claims and Consolidation of Actions

On October 28, 2020, PRE filed a complaint challenging Puerto Rico Law No. 60 of June 27, 2020 ("Act No. 60"), P.R. Laws Ann. T. 23 § 1101 *et seq*. **ECF No. 1**. PRE sought declaratory and injunctive relief, alleging that Act No. 60 violates the Commerce Clause of the United States Constitution and the Federal Relations Act, is preempted by the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2806 ("PMPA"), and effects a taking without just compensation in contravention of both the United States Constitution and the Puerto Rico Constitution. *Id*. at 4.[5]

On December 16, 2020, TEMPR initiated a separate action, Civil No. 20-1725, seeking declaratory relief that Sections 2 and 3 of Act No. 60 are preempted by the PMPA. Civil No. 20-1725, ECF No. 1. TEMPR also asserted a claim under 42 U.S.C. § 1983, alleging deprivation of civil rights. *Id*. at 1.

---

[5] "For preemption purposes, the laws of Puerto Rico are the functional equivalent of state laws." *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 323 (1st Cir. 2012) (citing *P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 499, (1988)).

Both PRE and TEMPR alleged that Sections 2 and 3 of Act No. 60 are preempted by the PMPA because they "indirectly affect[] the termination or non-renewal of petroleum franchises by prohibiting franchise contract terms that purport to give [plaintiffs] operational control over convenience stores and other ancillary businesses." *See* **ECF No. 248**. On March 9, 2021, the Court consolidated the two actions. **ECF No. 44**.

### B.    Commonwealth Defendants' Motion to Dismiss

The Commonwealth defendants moved to dismiss the consolidated actions. On September 22, 2021, the Court granted the motions in part and denied them in part. **ECF No. 71**. The Court dismissed the § 1983 claims but concluded that plaintiffs' Commerce Clause, preemption, and regulatory takings claims satisfied the plausibility standard. *Id*. The Court, however, emphasized the provisional nature of that determination. Observing that plaintiffs' theory rested exclusively on "secondary agreements," the Court expressed particular interest in the agreements themselves and issued a cautionary note:

> this determination to continue forward does not imply that the Court agrees with Plaintiffs' reading of the PMPA… Defendants posited various convincing arguments as to the narrow reading of the terms franchise and franchise relationship in the context of the sale, consignment or distribution of motor fuel, that will be afforded serious consideration from the Court when the time comes. Further… Act No. 60-2020 does not expressly regulate the circumstances in which franchisors may terminate a franchise or decline to renew a franchise relationship must be afforded considerable weight.

**ECF No. 71** at 30 (internal quotation marks omitted). On October 12, 2021, the Commonwealth defendants and PRGRA filed their responsive pleadings. **ECF Nos. 72–73, 88, 92, 94**.

### C.    Discovery and Delay

In 2021, the Court entered a case management order scheduling the close of fact discovery for February 2023. **ECF Nos. 87, 127**. Before that deadline, on December 16, 2022, the consolidated actions were reassigned to the undersigned. **ECF No. 131**. At the parties' request, and under the assumption that an extension might narrow the issues in dispute, the Court amended the case management order to extend the discovery deadline to March 21, 2023, and the deadline for expert disclosures to May 21, 2023. **ECF No. 134**.

On June 8, 2023, the Court held a status conference. **ECF No. 177**. Defendants represented that they had produced sufficient discovery and contended that plaintiffs' remaining requests were improper and oppressive. The outstanding requests sought, *inter alia*, personal information—including text messages—from Puerto Rico legislators, executive branch officials, public employees, the bill's sponsors, legislative staff, lobbyists, and other public officials who had issued reports or opinions regarding Act No. 60. *See* **ECF No. 174**. In light of the issues raised, the Court extended the discovery deadline to September 30, 2023. **ECF No. 177**.

Soon after, however, the Court issued an Opinion and Order granting defendants a protective order against plaintiffs' discovery requests, characterizing them as oppressive and unlawful. **ECF No. 193**. Underscoring the gravity of the issue, the Court remarked that it "had never encountered a case where a civil plaintiff literally went after the though[t] process and private communications of public officials when enacting a law in order to sustain claims of federal preemption, regulatory taking or… commerce clause [violations]." *Id*. at 16.

### D.      Amended Complaint

Following the close of discovery, defendants moved for summary judgment and to deposit with the Court funds to cover the fees of plaintiffs' expert witness for deposition. **ECF Nos. 206, 211**. Nearly two months later (and without having filed an opposition to the summary judgment motion), PRE moved for voluntary dismissal under Fed. R. Civ. P. 41(a)(2) of its takings and Commerce Clause claims. **ECF No. 217**. Defendants opposed and requested an award of attorney's fees. **ECF No. 218**.

The Court observed that Fed. R. Civ. P. 41 does not expressly contemplate the voluntary dismissal of only part of an action. **ECF No. 248**. While the rule permits dismissal of "an action" without a court order, it does not authorize dismissal of "part" of an action. *See Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 687 (9th Cir. 2005); *Gobbo Farms & Orchards v. Poole Chem. Co.*, 81 F.3d 122, 123 (10th Cir. 1995). Courts, however, have construed such requests as motions to amend under Fed. R. Civ. P. 15(a). *See Zuker v. Rodríguez*, Civil No. 12-1408 (PAD), 2017 WL 2345683, at *8 (D.P.R. May 30, 2017), *aff'd on other grounds sub nom. Zucker v. Rodríguez*, 919 F.3d 649 (1st Cir. 2019).

Considering the advanced stage of the proceedings, the delay in seeking withdrawal of the claims, indicia of bad faith, and the potential prejudice to defendants, the Court denied the request. *Id*.

E.       The Motions for Summary Judgment

Defendants' motion for summary judgment at **ECF No. 206** is straightforward. In their view, Act 60 is not preempted by the PMPA because the federal statute does not extend to secondary agreements unrelated to the dispensing and sale of motor fuel. *Id*. at 24. Accordingly, defendants contend that the franchise agreement's addendum governing the operation of convenience stores, as well as other ancillary side-business agreements, are not essential to the petroleum franchise or franchise relationship and therefore fall outside the PMPA's preemption scope. They maintain that the statute's plain text makes clear that the PMPA does not regulate every aspect of a petroleum franchise relationship, but only those matters closely tied to the termination or nonrenewal of agreements concerning motor fuel. In enacting the PMPA, they argue, Congress did not intend to preempt state legislation addressing the substantive dimensions of the franchisor-franchisee relationship, particularly in areas of traditional state concern such as the prevention of monopolies. *Id.*

Plaintiffs' position, by contrast, requires further elaboration. Contrary to the conventional framing of PMPA claims, plaintiffs construe the statute as conferring affirmative rights upon franchisors (not merely "flexibility" to adapt to market changes) to terminate or decline to renew petroleum franchise agreements or relationships. Second, although plaintiffs acknowledge that the PMPA's plain text governs only the termination of petroleum franchise trademark agreements or relationships, they contend that Congress intended the statute's reach to encompass ancillary, non-petroleum agreements that are nonetheless essential to the overall

franchise relationship. **ECF No. 245** at 2, 32; **ECF No. 221** at 2. Third, plaintiffs argue that certain

secondary agreements, such as those governing convenience store operations, though not

themselves petroleum-related, are integral to the petroleum franchise. *Id.*

On these premises, plaintiffs contend that Act 60 is preempted by the PMPA because it

interferes with their asserted rights to terminate agreements relating to non-petroleum products

and services. *See* **ECF No. 245** at 2 (Section 2 of Act 60 "limits franchisors['] federally protected

right to incorporate into its franchise business' initiatives related to fuel and nonfuel products

and services to be offered from their sites….");[6] **ECF No. 221** at 2 (Act 60 "extends divorcement[7]

provision and precludes a gasoline wholesaler… from terminating or choosing not to renew a

franchise agreement with any retailer that fails to comply with [non-motor fuel] provisions in a

franchise agreements[]" and "creates a cause of action."). Plaintiffs also argue that Section 3 of

Act 60 infringes on its PMPA rights inasmuch as it "allows the franchisee to sue for wrongful

termination under Puerto Rico law." **ECF No. 245** at 32. On their cross-request for summary

judgment, plaintiffs do not explain if any of their franchise agreements are in default, if they are

currently trying to terminate an agreements or relationship, or how Act 60 otherwise encroaches

on their rights to terminate or not renew. Instead, plaintiffs' argument is simply that Act 60's

---

[6] Although phrased in general terms, throughout their summary judgment filings, TEMPR and PRE proffered arguments and "evidence" almost exclusively as to the "convenience store" secondary agreements. *See* **ECF Nos. 221** and **245.**

[7] For undisclosed reasons, plaintiffs do not challenge Act 3, which sets out the overall operational divorcement between the oil company and the retailer. As conceded by the parties, Act 60 merely extends Act 3's divorcement requirement to, as relevant here, convenience stores operated at the gas stations. Neither do plaintiffs make reference to any authority striking down divorcement statutes in Puerto Rico or elsewhere.

divorcement mandate (which precludes plaintiffs from controlling the convenience store) may affect their franchisor rights under PMPA.

### F.      The R&R

After listing several findings of facts, the Magistrate Judge acknowledges that PMPA's franchise regulation is limited to motor fuel trademark. **ECF No. 304** at 12. However, taking note of Congress' discussions on PMPA, she concluded that property leases and motor fuel supply agreements fell within PMPA's purview. The Magistrate Judge further noticed that courts regularly examine the "degree of interrelation" between secondary agreements and the motor fuel franchise in determining whether they too fall within PMPA. *Id*., at 12-13. Given the economic aspects of the integrated franchises under scrutiny, the Magistrate Judge held that the convenience store addendums were essential to, and integrated with the petroleum franchise and relationship. *Id*., at 24.

The Magistrate Judge then noted that, pursuant to First Circuit precedent, "PMPA would preempt any state regulation setting rent rates if the state regulation did not allow a franchisor to terminate or not renew a franchise if it did not agree to the established rate." *Id*., at 19. She noted that Act 60 divestiture "is absolute… and thus indirectly prohibits distributors from including terms in the convenience store operation agreements that would allow distributors to terminate or refuse to renew any such agreements for the causes set forth in the PMPA." *Id*., at 20. Ultimately, she found an "irreconcilable conflict" between PMPA and Act 60 since the latter "prevents franchisors from taking action (*i.e.*, decisions to terminate… a franchise due to any of

the causes set forth in the PMPA) with respect to secondary arrangements essential to the operation of the motor fuel franchise[.]" *Id.*, at 24. Moreover, the Magistrate Judge found conflict between the two statutes because "franchisee[s] could initiate legal action against the franchisors for the very same conduct that would justify termination under the PMPA…." *Id*.

## G.    Defendants' Objections

### i.    Findings of Facts

Defendants logged specific objections to the findings of fact contained in the Magistrate Judge's R&R. *See* **ECF No. 311, 318**. Their primary contention is that the R&R relied on facts that are legally irrelevant to the question of federal preemption. To that end, defendants argues that facts 7-20, 23-32, and 35-46 are "completely immaterial to the pre-emption controversy" and should be set aside. **ECF No. 11** at 21-22; **318** at 14-19. Defendants also object because determining that an agreement is "essential" in the PMPA context is a legal determination, not a fact. Finally, they point out that the R&R incorrectly included statutory text and Congress' reports as factual findings. **ECF Nos. 311** at 2, **318** at 3, 16-17.

### ii.    Legal Challenges

Defendants object the characterization of the secondary agreements and the Magistrate Judge's conclusion that they are integrated to the main petroleum agreements. They argue that according to 15 U.S.C. § 2801(1) and case law, a PMPA franchise consists strictly of three elements: the premises lease, motor fuel trademark license, and fuel supply agreement. Any commercial activity outside of these three elements, such as the sale of "aspirin, beer, cigarettes,

deodorant, etc." in a convenience store, is the sole province of Puerto Rico law. **ECF No. 311** at

2, 9, 21-22; **318** at 14-19.

Defendants further object the R&R as it expands PMPA's preemptive reach. Specifically,

they argue that Act 60 does not address motor fuel sales, nor regulates termination of fuel

franchise agreements. Defendants posit that PMPA was designed to be a "shield" for retailers

against arbitrary acts by wholesalers, and the R&R improperly transforms it into a "sword" for

wholesalers to strike down valid state consumer protections. **ECF No. 311** at 22.

## II.    Legal Standard

### A.    Summary Judgment

Through summary judgment, courts "pierce the boilerplate of the pleadings and assay

the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ.*

*Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992). A court may grant summary judgment only when

the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Sands*

*v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir. 2000). A factual dispute is "genuine" if it could be

resolved in favor of either party; it is "material" if it potentially affects the outcome of the case.

*Murray v. Warren Pumps, LLC*, 821 F.3d 77, 83 (1st Cir. 2016); *Calero-Cerezo v. U.S. Dep't of Justice*,

355 F.3d 6, 19 (1st Cir. 2004). Although the court states the facts in the light most favorable to the

party against whom summary judgment is sought, the court is still required "to determine

whether either of the parties deserves judgment as a matter of law on facts that are not disputed."

*Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted).

The court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Anderson Plumbing Productions Inc.*, 530 U.S. 133, 135 (2000). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are functions of a jury, not of a judge. *See id.*

It is a "bedrock principle that a party opposing summary judgment must adduce specific evidence sufficient to create a genuine issue of material fact." *Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 777 (1st Cir. 2025). Local Rule 56(c) states, in pertinent part, that "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts" in which it "shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts."  L. Civ. R.  56(c). The opposing party may also include a "separate section [of] additional facts" which must comply with Local Rule 56(e). *Id.* Local Rule 56(e), for its part, provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. . . . The court shall have no independent duty to search or consider any part of the record not specifically referenced by the parties' separate statement of facts." L. Civ. R. 56(e). This is known as an "anti-ferret rule," which is "intended to protect the district court from perusing through the summary judgment record in

search of disputed material facts and prevent litigants from shifting that burden onto the court."

*López-Hernández v. Terumo Puerto Rico LLC*, 64 F.4th 22, 26 (1st Cir. 2023). Litigants ignore the

anti-ferret rule at their peril. *Rodríguez-Severino v. UTC Aerospace Sys.*, 52 F.4th 448, 458 (1st Cir.

2022). In the end, the nonmoving party is required to demonstrate "through submissions of

evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 108

(1st Cir. 2006).

B.    **Objections to R&R and Standard of Review**

United States Magistrate Judges are granted authority to make proposed findings and

recommendations on a motion for injunctive relief, while the ultimate resolution of the motion

remains at the discretion of the presiding judge. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b);

*accord* L. Civ. R. 72(a)(1). Any party adversely affected by the recommendation issued may file

written objections within fourteen (14) days of being served with the report and

recommendation. Fed. R. Civ. P. 72(b). A party that files a timely objection is entitled to a *de novo*

determination of "those portions of the report or specified proposed findings or

recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop*, 389 F. Supp.

2d 189, 191–92 (D.P.R. 2005) (citing *United States v. Raddatz*, 447 U.S. 667, 673 (1980)). "The district

court need not consider frivolous, conclusive, or general objections." *Rivera–García v. United*

*States*, Civ. No. 06–1004 (PG), 2008 WL 3287236, *1 (D.P.R. Aug. 7, 2008) (citing *Battle v. U.S.*

*Parole Comm'n*, 834 F.2d 419 (5th Cir. 1987)).

To the extent a party's objections amount to no more than general or conclusory objections to the report and recommendation without specifying to which issues in the report the party is objecting, or where the objections are repetitive of the arguments already made to the magistrate-judge, a *de novo* review is unwarranted. *Id.* "Instead, the report and recommendation is reviewed by the district judge for clear error." *Id.* (citing *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) ("It is improper for an objecting party to ... submit[ ] papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge. Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a R & R.")).

In conducting its review, the Court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate-judge." 28 U.S.C. § 636(b)(1); *see also*, *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir. 1985); *Álamo Rodríguez v. Pfizer Pharma., Inc.*, 286 F. Supp. 2d 144, 146 (D.P.R. 2003). Hence, the court may accept those parts of the report and recommendation to which the party does not object. *See Hernández–Mejías v. General Elec.*, 428 F. Supp. 2d 4, 6 (D.P.R. 2005) (citing *Lacedra v. Donald W. Wyatt Detention Facility*, 334 F. Supp. 2d 114, 125–26 (D.R.I. 2004)). The Court, however, "is not required to make separate findings of fact or issue an opinion setting forth its own reasoning." *U.S. v. Bach*, 388 F. App'x 2 (1st Cir. 2010) (citing *Jonco, LLC v. ALI, Inc.*, 157 F.3d 33, 35 (1st Cir. 1998)).

## III. Discussion

### A. Applicable Statutes

#### i. Puerto Rico Act 3

Act 3 of March 21, 1978, also known as the "Ley de Control de Productores y Refinadores de Petróleo y sus Derivados," P.R. Laws Ann. T. 23 § 1101 *et seq.* ("Act 3") became law in Puerto Rico. According to the statement of motives, Act No. 3 addresses several major concerns of the Puerto Rico Legislature. *Id*. Act No. 3 was driven by the urgent need to guarantee the stability and integrity of Puerto Rico's energy infrastructure, which is vital for its economic and social development. *Id*. Given the high degree of industrialization and citizen mobility, the Legislature emphasized that ensuring a continuous and reliable supply of fuel is essential for maintaining the Island functioning. *Id*. Consequently, the Legislature explicitly states that the Act is an exercise of the State's police power and its constitutional authority to regulate commerce to protect the general welfare and economic interests of the people against practices that threaten the stability of the market. *Id*. A central motive for this legislation was to combat the concentration of control or monopoly over energy supplies by a small number of producers and refiners who dominate all aspects of the industry, from production to marketing. *Id*. Thus, Act 3 seeks to ensure the broadest possible competition at the retail level by mandating operational divestiture,[8] which prohibits producers and wholesalers from directly operating service

---

[8] The term divorcement law, or similar terms found in the parties' briefs such as "divestiture" or "disassociation," generally refer to regulation that seeks to eliminate or lessen vertical integration between petroleum refining and retail marketing. *See generally Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125 (1978); *United States v. Socony-*

stations. *Id*. As such, Act 3 is what is generally known as a "divorcement law." *See* **ECF No. 221** at 2.

### ii.    Amendments to Puerto Rico Act 3

Following the steps of Act 3, on June 27, 2020, the Puerto Rico Legislature passed Act No. 60 to amend Act 3, which the Legislature considers of high public interest. *See Statement of Motives* **ECF Nos. 236-6; 311-1; 311-2; 311-3**. Act 60's statement of motives indicates that the petroleum industry has evolved since the adoption of Act 3 and that some loopholes have allowed wholesalers to bypass the statute's prohibitions on direct operation by oil companies. Specifically, Act 60 now includes "convenience stores" within the definition of a "retail service station" subject to the "divestiture" or divorcement rules. *Id*. Furthermore, the definition of "petroleum producer" was updated to include entities that store and mix fuel in "tank farms," reflecting the shift from local refining to importing and processing gasoline on the island. *Id*.

A second major goal of Act 60 was to provide more efficient legal remedies for those harmed by unfair commercial practices. *Id*. The Legislature noted that relying solely on the Puerto Rico Office of Monopolistic Affairs was often a "too slow" process, leaving franchisees or retailers without timely relief. *Id*. Consequently, Act 60 establishes a private cause of action, allowing prejudiced individuals or businesses to sue directly to uphold the goals of the statute. *Id*. By strengthening these legal tools and reaffirming the principle of operational divestiture,

---

*Vacuum Oil Co.*, 310 U.S. 150, 191 (1940) ("fully integrated—producing crude oil, having pipelines for shipment of the crude to its refineries, refining crude oil, and marketing gasoline at retail and at wholesale.")

Act 60 seeks to prevent producers and wholesalers (franchisors) from unfairly controlling retail prices or profit margins, thereby ensuring healthy competition and protecting the consumer. *Id.*

Specifically, Section 1 of Act 60 amended Act 3's Article 1 to include in the "retail service station" definition "any place of business where an individual or legal entity sells gasoline and/or special fuels for motor vehicles… [and] shall also include… such as, but not limited to: vehicle inspection and registration sticker sales, carwash and lubrication services, mechanical repair shops… the sale and installation of tires, batteries… a convenience store, the sale of food, household items, novelties[.]" *See English Certified Translation* at **ECF No. 236-6 at 4**.

Section 2 of Act 60 amended Act 3's Article 4-A, which, in relevant part, now provides "[n]o petroleum refiner… may… operate, directly or indirectly, a retail service station in a manner such that their complete operational dissociation is prevented…." *See English Certified Translation* at **ECF No. 236-6** at 5; **311-2**. Finally, Section 3 of Act 60 amends Act 3's Article 8 to incorporate a new cause of action allowing "any individual… whose… property… [is] adversely affected… as a result of acts… prohibited… under the provisions of [these Articles], and who [has] filed a case with the Antitrust Office and has not been provided with, at least, a preliminary report containing a determination as to the whether… an adjudicative process… may file a claim with the [court] and shall be entitled to compensation for the damages suffered… costs… and a reasonable sum of attorney's fees." *Id.*, at 6.

      **iii.    PMPA**[9]

---

[9] 15 U.S.C. § 2801 *et seq.*

Retail gas stations are usually "operated by independent franchisees" under certain terms and conditions set out in "petroleum franchise agreement." *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, 559 U.S. 175, 178 (2010). In these agreements, the franchisor typically "leases the service-station premises to the franchisee, grants the franchisee the right to use the franchisor's trademark, and agrees to sell motor fuel to the franchisee for resale." *Id*.[10]

In 1978, Congress took notice of "widespread concern over increasing numbers of allegedly unfair franchise terminations and nonrenewals in the petroleum industry." *Id*. In response, it enacted PMPA as a conventional "dealer [or franchisee]-protection" statute. *Santiago-Sepúlveda v. Esso Standard Oil Co. (Puerto Rico)*, 643 F.3d 1, 4 (1st Cir. 2011). In other words, PMPA created franchisee rights by limiting the circumstances in which a franchisor can terminate or choose not to renew a petroleum franchise relationship. *See id*., (quoting *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 746 (1st Cir. 1991)). PMPA's franchisee protections "rests on the perceived disparity of bargaining power between franchisor and franchisee… coupled with concerns said to be peculiar to franchising." *Id*., (citing *Veracka v. Shell Oil Co.*, 655 F.2d 445, 448 (1st Cir. 1981)); *Draeger Oil Co. v. Uno–Ven Co.*, 314 F.3d 299, 299 (7th Cir. 2002) (internal quotations omitted)). "PMPA attempts to level the playing field by restricting the grounds upon which a franchisor can assert a unilateral termination or nonrenewal of a franchise." *See Marcoux v. Shell Oil Products Co., LLC*, 524 F.3d 33, 39 (1st Cir. 2008) (cleaned up).

---

[10] In some States, including Puerto Rico, disassociation or non-vertical integration operation of retail stations are mandated by statute. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125 (1978).

To achieve that goal, Congress enacted a "single, uniform set of rules to govern the grounds for the termination or nonrenewal of franchises." *Esso Standard Oil Co. v. Dep't of Consumer Affs.*, 793 F.2d 431, 432 (1st Cir. 1986).

One of PMPA's "secondary purpose[s]"[11] is to "provid[e] adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 747 (1st Cir. 1991). That "flexibility" consists of latitude to "chang[e] the terms of a franchise upon renewal[]" in order to "respond[] to changing market conditions." *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1390 (9th Cir. 1986); *see* **ECF No. 221** 8-9.

Moreover, PMPA defines a "franchise" as a contract pursuant to which a refiner or distributor "authorizes… a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned… by a refiner which supplies motor fuel to the distributor which authorizes or permits such use." 15 U.S.C. § 2801(1)(A). The "term franchise includes[:]"

> (i)  any contract under which a retailer… is authorized… to occupy leased marketing premises… to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark…
> (ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed—
> (I) under a trademark owned or controlled by a refiner….

---

[11] *Mobil Oil Corp. v. Virginia Gasoline Marketers & Auto. Repair Ass'n, Inc.*, 34 F.3d 220, 223 (4th Cir. 1994).

15 U.S.C. § 2801(1)(B). The term "franchise relationship," on the other hand, means "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." *Id.*, § 2801(2). A "franchisor" under PMPA is the "refiner or distributor… who authorizes or permits, under a franchise, a retailer… to use a trademark in connection with the sale, consignment, or distribution of motor fuel," while the "franchisee" is the "retailer… who is authorized… under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel." *Id.* §§ 2801(3)-(4).

It also limits franchisor's grounds for termination or nonrenewal of any franchise relationship to those "specifically enumerated grounds and upon compliance with certain notification requirements." *Esso Standard Oil Co. v. Dep't of Consumer Affs.*, 793 F.2d 431, 432 (1st Cir. 1986) (citing 15 U.S.C. §§ 2802–04).[12] Among them, in relevant part, PMPA authorizes a franchisor to terminate franchise agreement or not renew a franchise relationship because of the franchisee's "failure" to "comply with any provision" of the franchise agreement, "which provision is both reasonable and of material significance to the franchise relationship." 15 U.S.C. § 2802(b)(2)(A). PMPA also recognizes cause for termination if a franchisee fails "to exert good faith efforts to carry out the provisions of the franchise," *id.*, § 2802(b)(2)(B), or upon "the occurrence of an event which is relevant to the franchise relationship." *See Id.*, § 2802(b)(2)(C)).

---

[12] Among other relief, under the PMPA, a franchisee may challenge a franchisor's termination or nonrenewal of the franchise relationship and seek equitable and injunctive relief, actual damages, exemplary damages, and attorney and expert fees. *Id.*, § 2805.

It is important to note, however, that "failure" under PMPA:

"does not include… any failure which is only technical or unimportant to the franchise relationship…[13] any failure for a cause beyond the reasonable control of the franchisee; or… any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).

15 U.S.C. § 2801(13). Pursuant to 1994 amendments,[14] PMPA also includes a release or waiver of rights provision which states that "[n]o franchisor shall require… a franchisee to release or waive… any right that the franchisee has under… Federal law; or… any right that the franchisee may have under any valid and applicable State law." 15 U.S.C. § 2805(f).

Finally, the PMPA also includes a self-contained preemption clause. It provides that:

[t]o the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter….

15 U.S.C. § 2806(a). "[T]hrough its express preemption provision, Congress indicated that **it did not intend to preempt all state provisions involving the substantive aspects of petroleum-**

---

[13] As noted before, franchise relationship is directly attached to the petroleum agreements or obligations. 15 U.S.C. § 2801(2) ("the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise."). *Id*.

[14] *See* P.L. 103-371, 108 Stat. 3484 § 6 (1994). Defendants note that these amendments came into effect after most of the cases cited by plaintiffs and the Magistrate Judge were decided. *See* **ECF No. 311** at 16.

**products franchises**." *ESSO Standard Oil Company, et al., v. Department of Consumer Affair*, 793

F.2d at 434 (cleaned up)(emphasis added). Plaintiffs concede that pursuant to the limited First

Circuit case law available on PMPA's preemption,[15] "state laws enacted to address a specific

substantive term of a franchise agreement and that do not infringe upon the termination and

nonrenewal grounds set forth in the PMPA may well be upheld." **ECF No. 221** at 10.

### B. This Court's *De Novo* Review

#### i. Undisputed facts

Defendants object several of the Magistrate Judge's findings because they are either not

"factual" in nature or are otherwise irrelevant to the preemption question. **ECF Nos. 311** at 21-

22; **318** at 17. Although the Court agrees that some of the findings in the R&R are not Fed. R.

Civ. P. 56 material,[16] the facts essential to the controversy at hand are uncontested.[17] Notably,

defendants themselves acknowledge that no factual determinations are necessary because the

issue before the Court presents solely a "matter of law." **ECF Nos. 311** at 22; **318** at 18. Plaintiffs,

for their part, have not objected to the R&R. Accordingly, the Court need not address the

---

[15] In fact, the Magistrate Judge noted in her R&R that there is only one First Circuit case "that has dealt with the preemptive scope of the PMPA." **ECF No. 304** at 19.

[16] For example, the Magistrate Judge incorrectly included statutory text and conclusions of law as "factual findings." *See inter alia* **ECF No. 304** at 5-6.

[17] The Court draws the facts from the well-pleaded facts of the complaint and the statements of proposed facts submitted by the parties that comply with Local Rule 56. *See CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). Although the Court reviewed every statement submitted by the parties, it will only consider and include in this Opinion and Order those facts that are material and uncontested for purposes of summary judgment as mandated by Fed. R. Civ. P. 56.

objections to the findings of fact, as there are "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).[18]

### ii.      Interpretation of PMPA

Throughout their objections, defendants place great emphasis in plaintiffs' unusual formulation of PMPA claims. They argue that instead of reading PMPA as a shield protecting franchisee's interests, plaintiffs wield PMPA as a sword against them. According to them, this application of PMPA would "defeat PMPA's purposes." **ECF No. 318** at 13.

"In interpreting a statute, we strive 'to effectuate congressional intent.'" *United States v. Freeman*, 147 F.4th 1, 13 (1st Cir. 2025), *cert. denied,* No. 25-762, 2026 WL 490587 (U.S. Feb. 23, 2026) (quoting *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020)). Although normally the "starting place for such an inquiry is the statutory text itself[,]" legislative history and other tools "carry significant weight only when the text is ambiguous or its plain meaning leads to an absurd result." *Id.* (quoting *City of Providence v. Barr*, 954 F.3d at 31-32).

In this case, the parties agree that PMPA's prohibitions extends beyond the plain text of the statute, which only regulates termination of franchise agreements or relationships with regards to motor fuel trademark. Because the inquiry before the Court lies beyond the text of the statute and asks the Court to interfere with Puerto Rico police powers, the Court must tread lightly moving forward. *Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 74

---

[18] In any event, factual findings would only help in determining whether the convenience store agreements are embedded to the petroleum agreements. But, since the Court reaches its determination even under the assumption that they are, the objections are inconsequential.

(1st Cir. 2002)(cleaned up)(stating that PMPA "is statute is in derogation of common law rights, and therefore should not be interpreted to reach beyond its original language and purpose."). Moreover, because preemption is front and center, the Court looks at the text for Congress' intent and, secondarily, the Court also considers context and the "overall purpose" of the statute. *See Triumph Foods, LLC v. Campbell*, 156 F.4th 29, 50 (1st Cir. 2025); *Nw. Selecta, Inc. v. González-Beiro*, 145 F.4th 9, 15 (1st Cir. 2025).

### iii.    Secondary Non-Petroleum Agreements and PMPA

The Supreme Court has recognized that a petroleum franchise covered under PMPA encompasses the trademark agreements, the property lease of the station's premises, and the fuel supply agreement. *See Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, 559 U.S. at 182 (holding that franchisee needs to show that the franchisor directly or indirectly put an "end to the franchisee's… purchase of the franchisor's fuel, or occupation of the franchisor's service station[,]" to bring a claim for constructive termination under PMPA). Indeed, according to Senate Reports cited by the parties and the Magistrate Judge, "[s]econdary arrangements, such as leases of real property or motor fuel supply agreements, are incorporated in the definition of a franchise[.]"[19] However, the expansion of PMPA to those agreements that are not included in the text has a reason: to prevent franchisors from "circumvent[ing] [PMPA] by a termination…

---

[19] S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873.

of the real estate lease or motor fuel supply agreement" rendering the "trademark license valueless."[20]

Defendants concede that the lease of the premises and the fuel supply agreements are implicitly within the petroleum franchise scope, but they draw a line as to other non-petroleum agreements. *See* **ECF No. 311** at 2, **318** at 5. The Magistrate Judge, on the other hand, determined that the convenience store agreements are also essential and integrated to the petroleum franchises. **ECF No. 304** at 23-24. She noted that courts regularly "examine the degree of interrelation" between secondary agreements and the petroleum franchise to determine if the ancillary agreement fall within PMPA's purview regardless of whether such secondary agreements were petroleum related or not. **ECF No. 304** at 12. Plaintiffs[21] and Magistrate Judge concluded that such cases did not "outright reject non-fuel agreements as non-essential to the motor fuel franchise and out of the PMPA preemptive scope." *Id*., at 23. Rather, these decisions "contemplate the possibility that secondary arrangements, such as those for the operation of

---

[20] Sen. Rep. No. 95–781, 75th Cong., 2d Sess., reprinted in [1978] U.S. Code, Cong. & Ad. News 873, 888 ("Senate Report").

[21] In support of its integration of agreements arguments, TEMPR only cited *Millett v. Union Oil Co. of California*, 24 F.3d 10 (9th Cir. 1994) and *Santiago-Sepúlveda*, 638 F. Supp. 2d 193 (D.P.R. 2009); *Total Petroleum P.R. Corp. v. Villa Caparra Esso Service Center*, Civil No. 16-2436 (PAD/BJM), 2018 WL 6132540 (D.P.R. Oct. 30, 2018) and *Total Petroleum P.R. Corp. v. Fonseca-Marrero*, Civil No. 16-2436 (PAD) 2018 WL 6131777 (D.P.R. Nov. 11, 2018). In the latter two cases, however, the plaintiff claimed that defendants-franchisees breached, among others, its trademark, lease, and fuel supply obligations, in other words, PMPA core agreements. Moreover, the franchisees did not oppose plaintiffs' requests for judgment against them. **ECF No. 245** at 26-27. Thus, these cases are not persuasive for present purposes. Similarly, PRE references *Millet*, *Santiago-Sepúlveda*, and *Valentine v. Mobil Oil Corp*., 789 F.2d 1388, 1389 (9th Cir. 1986) in support of the integration argument. **ECF No. 221** at 12-13. However, *Valentine v. Mobil Oil Corp*., has no relevant discussion on the integration non-petroleum agreements to the relationship protected by PMPA. *Id*., at 1390. (holding that PMPA does not "give[] a dealer the right to continue operating a service station in a particular fashion, or precludes a franchisor from altering the scope or operation of the business[,]" at the time of renewal).

convenience stores in gas stations, may be essential to the motor fuel franchise and covered by the PMPA." *Id*.

While the Court acknowledges the Magistrate Judge's correct observation that some courts have recognized that non-petroleum side contracts may be deemed essential and thus fall within the preemptive ambit of the PMPA, the Court disagrees from Magistrate Judge's assessment regarding their persuasiveness in the context of the present litigation. Beyond the non-binding nature of these out-of-circuit decisions, some of the opinions relied upon by the Magistrate Judge appear to militate in favor of the defendants' position. Moreover, these cases are markedly distinguishable from the instant controversy in several material respects and, thus, unpersuasive here.

### a.    Out-of-Circuit Cases

First, in the case of *Smith v. Atlantic Richfield Co.*, 533 F. Supp. 264 (E.D. Pa.), *aff'd,* 692 F.2d 749 (3d Cir. 1982) the plaintiff, a service station franchisee, challenged the termination of his convenience store agreement by the defendant. The conflict arose after the plaintiff refused to remove coin-operated video games from the store, prompting defendant to terminate the convenience store franchise while leaving the separate motor fuel lease intact. The plaintiff argued that the convenience store and the gasoline station were "so intertwined and interdependent" that they constituted a single franchise, meaning the termination of the store agreement effectively terminated the motor fuel franchise under the PMPA. *Id*., at 267.

The plaintiff contended that the motor fuel operation was controlled by equipment located within the convenience store, making independent operation physically impossible. *Id.*, 267-268. Moreover, he argued that the gasoline business would be unprofitable without the convenience store marketing scheme and that a provision in the lease increasing royalty payments upon termination of the store agreement was a tactic intended to circumvent the PMPA's protections. *Id.*, at 268. The plaintiff relied on legislative history suggesting that "secondary arrangements" like real estate leases are incorporated into the PMPA to prevent franchisors from rendering a trademark license valueless through collateral terminations. *Id.*

The court ruled that PMPA's scope is strictly limited to motor fuel franchises and does not extend to convenience stores unless they are "essential" to the fuel operation. It held that the mini-market agreement was not an essential secondary arrangement because its termination did not deprive the plaintiff of the use of the premises or the equipment necessary to sell gasoline. *Id.*, 268-269. The court also found the plaintiff's economic arguments "baseless," noting that he remained free to operate a different type of convenience store on the same premises without the defendant's trademark. *Id.*[22]

---

[22] The court specifically reasoned that a "claim that termination of the [convenience store] franchise constitutes the termination of a 'franchise' under the PMPA on grounds of physical and economic interdependence is factually and legally insufficient... Even if Congress did intend the PMPA to recognize instances of physical and economic interdependence, Congress only intended the act to apply to essential secondary arrangements and the… Convenience Store Agreement was not a secondary agreement essential to plaintiff's motor fuel franchise." *Id.*, at 269.

In *Atlantic Richfield Co. v. Brown*, Civil No. 85-5131, 1985 WL 3316, at *7 (N.D. Ill. Oct. 21, 1985) the litigation arose from the plaintiff's decision to withdraw from the gasoline market east of the Mississippi river. In addition to gasoline service stations, many franchisees operated convenience stores on the leased premises under separate franchise agreements. *Id*. According to the relevant agreements, the termination of the underlying premises lease would automatically terminate the mini-market agreement. Plaintiff also contended that the new franchise offers from third parties were discriminatory because they included a new "convenience store addendum" that restricted the use of the premises. *Id*., at *5.

The court ruled that the PMPA governed the termination of the mini-market agreements under these circumstances since the termination of the premises lease automatically triggered the termination of the mini-market franchise, the agreements were "so inextricably linked" that federal law must apply to the entire relationship. *Id*., at *7. The Court noted however, that if only the mini-market agreement had been terminated, the PMPA would not apply, and the relevant state law would not be preempted. *Id*. ("This court agrees that if only the mini-market agreement had been terminated, the PMPA would not apply and the IFDA would not be preempted.").[23]

In *Aurigemma v. Arco Petroleum Products Co.*, 698 F. Supp. 1035 (D. Conn. Oct. 26, 1988) the plaintiffs, who operated both gasoline stations and convenience stores under separate agreements with defendant, challenged the termination of their convenience store franchises

---

[23] Plaintiffs in the case at bar do not claim that they seek termination of the convenience store agreement and one of the core petroleum franchise agreements such as the trademark, property lease or fuel supply agreements.

following the franchisor's decision to withdraw from the Connecticut motor fuel market. In relevant part, the plaintiffs alleged that defendant breached the mini-market agreement and violated state law by terminating the convenience store operations based solely on the termination of the underlying petroleum premises lease. Defendant contended that the mini-market agreement was validly terminated because it contained a provision for automatic termination upon the end of the premises lease, which defendant had lawfully terminated under the PMPA's market withdrawal provisions. Defendant relied on *Atlantic Richfield Co. v. Brown*, arguing that the gasoline and convenience store agreements were "inextricably linked" and that the PMPA should therefore preempt state law for both. *Id.*, at *1041.

The court rejected this argument, finding that the PMPA does not preempt state franchise law regarding the termination of convenience store agreements. The court noted that, unlike the fuel operations withdrawn from the relevant market, there was "no business reason" why the convenience store could not exist independently of a petroleum franchise, and some such stores indeed operated without selling fuel. *Id.*

In *Rosedale Plaza Group, LLC v. BP West Coast Products LLC*, 665 F. Supp. 2d 1118 (E.D. Cal. Oct. 14, 2009) the plaintiff-franchisee challenged the franchisor's decision to condition the renewal of its motor fuel franchise on the mandatory execution of a convenience store franchise agreement. The plaintiff argued that under PMPA, the franchisor could not lawfully require the renewal of a "non-motor fuel" and "non-necessary" secondary agreement as a prerequisite for maintaining a petroleum franchise. *Id.*, at 1122. In contrast, the franchisor maintained that it

possessed the legal right to require renewal of both the motor fuel and convenience store agreements as a single integrated business model. The franchisor argued the two were "intrinsically linked" because they shared a single facility, identical 24-hour schedules, a common accounting system, and integrated payment processing where customers must pay inside the store for fuel dispensed at the pumps. *Id.*, at 1123.

The court reasoned that "PMPA may not be circumvented by terminating secondary arrangements essential to the operation of the motor fuel franchise. It does not indicate that all secondary arrangements are covered…." *Id.*, at 1124-1125. However, it denied both parties' motions for summary judgment, finding that the record was not proper for a summary judgment ruling as material issues of disputed fact precluded a ruling as a matter of law.[24]

Other courts have adopted a different view on the integration of non-motor fuel agreement into the PMPA-protected petroleum franchise agreements or relationship.[25] Plaintiffs only point to two relevant cases in support. In *Millett v. Union Oil Co. of California*, 24 F.3d 10 (9th Cir. 1994) the plaintiffs were motor fuel franchisees who also operated auto repair franchises under separate agreements with Unocal (defendant). When defendant decided to disinvest from the Washington and Oregon markets and refused to renew these agreements, the franchisees filed suit seeking goodwill compensation under state law. The franchisees' primary

---

[24] Specifically, the judge ruled that the degree of interdependence between the agreements presented a mixed question of fact and law that would require expert testimony and a trial to resolve. *Id.*, at 1124-1125.

[25] According to plaintiffs' briefs, these account for only a minority. *See* **ECF Nos. 221 at 13**; **245** at 26-27. Indeed, as discussed above, some of the cases cited by Magistrate Judge that deal with the issue of integration of secondary agreements to the core PMPA contracts support defendants' position.

claim was for failure to give notice as required under state law. Indeed, defendant only provided notice in accordance with PMPA. Defendant argued that only notice under PMPA was necessary because there was a clause in the auto repair agreements that made non-renewal of the motor fuel franchise an automatic trigger for the non-renewal of the auto repair franchise. *Id.*, at 12.

The relevant question was whether these secondary agreements (auto repair) were separate or were "sufficiently related" to the motor fuel franchises to fall under the preemptive reach of the PMPA. *Id.*, at 14-15. The franchisees argued that auto repair shops were not facially included in the PMPA's definition of a franchise and were therefore governed by state law. However, the court noted that the PMPA's legislative history indicates that while certain contracts (like those for tires or batteries) are excluded, "secondary arrangements" that are integral to the relationship are incorporated into the federal definition to prevent franchisors from circumventing the act. *Id.*, at 15. The Ninth Circuit affirmed, concluding that the auto repair agreements were covered by PMPA, and that state law notice requirement was preempted. Consequently, the court held that the PMPA's 90-day notice requirement applied, and the franchisees' claim for goodwill payments under state law failed. *Id.*

Notably, these out-of-circuit cases reach different results and deal with very specific facts that are not similar to the case at bar. Some of them recognize that convenience store agreements could fall under PMPA, but that determination is made in light of the facts of each case. Most of them cut against plaintiffs' claims, and those that could be read to support plaintiffs were decided on very different facts.

b.      First Circuit Cases

Finally, plaintiffs cite one case within the Puerto Rico District in support, namely *Santiago-Sepúlveda v. Esso Standard Oil Company (Puerto Rico) Inc.*, 638 F. Supp. 2d 193 (2009) ("*Santiago-Sepulveda*, 638"). *Santiago-Sepúlveda*, 638 addresses several motions for reconsideration that were filed in connection with a handful of orders and judgment entered by that court. In the *Santiago-Sepúlveda v. Esso Standard Oil Company (Puerto Rico) Inc.* consolidated litigation, plaintiffs (former Esso franchisees) challenged the new franchise agreements offered by the franchisor-assignee after Esso withdrew from the Puerto Rico market.

Among the many assignments of error discussed in *Santiago-Sepúlveda*, 638, some of which were carefully address, while others were more briefly dealt with in consideration of the Fed. R. Civ. P. 59(e) heightened test, plaintiffs pick the court's conclusions as to the Federal Trade Commission ("FTC") "circular" requirement. Specifically, the *Santiago-Sepúlveda*, 638 plaintiffs' claim that the new franchisor failed to provide a required FTC "offering circular" for the convenience store franchise. The court found no violation. Instead, it held that because the convenience store operation was "incidental and complementary" to the marketing of motor fuel, it was part of the "franchise relationship" governed by the PMPA. *Id.*, at 203. Consequently, the relationship fell under a specific FTC exception (16 C.F.R. § 436.8(4)) that exempts PMPA-covered franchises from separate disclosure document requirements. *Id*.

However, this case is not persuasive in the present context. If anything, it would appear to support defendants' position. First, the portion of *Santiago-Sepúlveda*, 638 cited by plaintiffs is

irrelevant to the issue here. To wit, plaintiffs cite portions of *Santiago-Sepúlveda*, 638 that addresses the assignment of the business from Esso to Total and the application of FTC regulation. Absolutely nothing was said about the issue of integration of secondary agreement. Second, even those portions of the *Santiago-Sepúlveda*, 638 opinion that do discuss the agreements (not cited in support by plaintiffs) do not explain why the secondary agreements were "essential" to the petroleum franchise. *Id.,* at 203. Instead, the Court went on the assumption that the agreements were under PMPA. *Id.*, ("I have already held that the parties' franchise relationship as a whole is governed by the PMPA."). Thus, it provides little guidance to this Court.

Third, and perhaps of greater significance here, the *Santiago-Sepúlveda*, 638 court **applied Puerto Rico law** to invalidate certain provisions of the agreements executed by the parties. *See Santiago-Sepúlveda*, 638 at 200, (citing *Santiago-Sepúlveda v. Esso Standard Oil Co. (Puerto Rico)*, 582 F. Supp. 2d 154, 182 (D.P.R. 2008)). Accordingly, taking the conclusions of the sister court at face value, would necessarily mean that PMPA permits the application of state law. That conclusion stands in direct tension with plaintiffs' position here. Indeed, it undermines the central premise of their theory: that no Puerto Rico law may affect the terms and conditions of either core PMPA agreements or secondary agreements.

\*\*\*

As carefully discussed above, the available case law is neither binding nor persuasive in this case. The facts in this case are too dissimilar to rely on such cases beyond the general

proposition that, in some instances, non-petroleum agreements may be integrated as essential components of PMPA core contracts.

There is no question that courts depart from the PMPA's plain text only to effectuate the statute's overarching purposes. *See Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 74 (1st Cir. 2002)(cleaned up)(stating that PMPA "statute is in derogation of common law rights, and therefore should not be interpreted to reach beyond its original language and purpose."). That purpose, as discussed above, is to protect franchisees from arbitrary termination of their petroleum trademark license, including through the termination of secondary rights such as the lease of the premises and the fuel supply. Accordingly, any interpretation that extends beyond the statute's plain text, including determinations as to which agreements are "essential" or "intertwined"[26] and thus protected by the PMPA, must likewise be guided by the statute's purposes. Under that guidepost, the Court first notes that PMPA protection is not sought here to protect franchisees from arbitrary termination, nor is it requested to regulate the franchisor-franchisee relationship.

Second, Congress made clear that it did not intend to include within the definition of a petroleum franchise any agreement that is not directly related to the core petroleum components, namely, the trademark, the property lease, and the fuel supply agreements. Specifically, in enacting the PMPA, Congress did "not intend[] to encompass other contractual arrangements which may exist between a franchisor and a franchisee, e.g. credit card

---

[26] Terms not included by Congress in PMPA.

arrangements, contracts relating to financing of equipment, or contracts for purchase and sale of tires, batteries, or automotive accessories."[27] Accordingly, it is difficult to maintain that the PMPA was intended to protect franchisors' "rights" in the same manner and to the same extent as it protects franchisees, and more difficult still to contend that Congress envisioned in PMPA a right for franchisors to challenge state regulation that neither expands nor contracts the statute's termination or non-renewal grounds for motor fuel franchise agreements or relationships.[28]

Third, absent PMPA, the regulation of petroleum franchisors' businesses lay with the states. *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, at 185–86 ("Prior to 1978, the regulation of petroleum franchise agreements was largely a matter of state law."). In relevant part, Congress intervened only to regulate a discrete area: the termination and notice of petroleum franchise agreements or relationships. Plaintiffs' reading would effectively strip states of their authority to regulate all other aspects of petroleum franchisors' businesses whenever the franchisor deems such matters "essential."

In light of the above, the Court disagrees with plaintiffs and the Magistrate Judge. A franchisor may not incorporate within the meaning of a PMPA petroleum franchise any agreement it deems economically "essential," even assuming that characterization to be accurate, for purposes of seeking a blanket preemption ruling against all state legislation that

---

[27] S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873.
[28] Neither does Act 60 alter PMPA notice requirements for franchisors.

affects their profit margins. Such a conception (i) finds no support in the statutory text, (ii) does not comport with the statute's purpose of protecting franchisees, and (iii) would operate to expand the PMPA's reach far beyond its expressly delineated scope, namely, the regulation of termination grounds for petroleum franchise agreements or relationships. While the integration of "essential" non-petroleum agreements into the petroleum franchise may be recognized in certain cases, this is not one of them, especially since plaintiffs do not allege that, but for Act 60, they tried to terminate or otherwise not renew a relationship with one of their franchisees.

In any event, even assuming that the convenience store addendum is both "essential" and "integrated" to the petroleum franchise, the Court harbors serious doubt that Act 60 is preempted by the PMPA.

### iv.    PMPA's Preemption

#### a.    Preemption, in General

The Supremacy Clause states in relevant part that "This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land...." U.S. Const. art. VI, cl. 2. It bestows upon Congress the power to preempt state laws. *See Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022). Whether preemption is expressed or implied, state action that interferes with federal regulation "must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).

When federal law contains an express preemption clause, courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (internal quotation marks

omitted). Congressional "intent is the ultimate touchstone…." *Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico, Inc. v. Emanuelli Hernández*, 58 F.4th 5, 11 (1st Cir. 2023)(quoting *First Med. Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 51 (1st Cir. 2007)). Implied preemption, on the other hand, "can take one of two forms: field preemption or obstacle preemption." *Asociación De Detallistas De Gasolina De Puerto Rico, Inc. v. Puerto Rico*, 138 F.4th 686, 693 (1st Cir. 2025).

Field preemption applies to state regulation of "conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "Where Congress occupies an entire field… even complementary state regulation is impermissible." *Id.*, at 401. Obstacle conflict preemption takes place "either when compliance with both state and federal regulations is impossible or when state law interposes an obstacle to the achievement of Congress's discernible objectives." *Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 15 (1st Cir. 2000). "Cases of obstacle preemption (like all forms of preemption) fit into the following mold: 'Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted.'" *Me. Forest Prods. Council v. Cormier*, 51 F.4th at 6 (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018)).

### b.     The R&R's Discussion on Preemption

According to the R&R, the only First Circuit opinion on the issue of PMPA preemption dates back to 1986. In *Esso Standard Oil Co. v. Department of Consumer Affairs*, 793 F.2d 431 (1st

Cir. 1986) five major oil companies challenged Regulation 2758 of the Commonwealth of Puerto Rico, which established controls over the rents charged to gasoline filling stations. The oil companies argued that PMPA preempted this regulation because the PMPA grants franchisors the right to demand any rent they wish as a condition for renewal, provided the demand is made in "good faith" and in the "ordinary course of business." *Id.*, at 433-434. They contended that by capping rents and allowing a government agency to fix rental rates when negotiations fail, the Commonwealth impermissibly skewed the federal balance of power intended to protect franchisor flexibility. *Id.*, at 434.

The relevant analysis centered on the express preemption provision of the PMPA (15 U.S.C. § 2806), which stipulates that state laws are only preempted if they concern the "termination or nonrenewal" of a franchise and are not identical to federal law. *Id*. The court determined that Regulation 2758 does not govern the grounds for ending a franchise relationship; instead, it regulates a "substantive element" of the franchise agreement itself, specifically, the cost of the real estate lease. *Id.*, 434-435. Crucially, the court ruled that the rent control regulation was not preempted because it did not destroy the franchisor's power of termination. *Id.*, at 434 (finding that "a franchisor remains free to terminate or not renew a franchise if it does not wish to accept the rent established by DOCA.[29] The Commonwealth's rent control regulation gives neither franchisees nor franchisors rights or responsibilities in the specific area of termination or nonrenewal greater than those granted by the PMPA."). The First

---

[29] Acronym for the Puerto Rico's Department of Consumer Affairs.

Circuit explained that, in any event, DOCA regulation provided that the franchisor remained free to terminate or not renew the franchise in accordance with PMPA procedures.

The Magistrate Judge held that Act 60 should be preempted because, unlike *Esso Standard Oil Co. v. Department of Consumer Affairs*, it does not give the franchisor a way out. The Court disagrees. What *Esso Standard Oil Co. v. Department of Consumer Affairs* requires is that the challenged regulation, (i) "allow a franchisor to terminate or not renew a franchise if it did not wish to accept that established rate[]" or (ii) that it does not "g[i]ve a franchisee a cause of action to contest a termination of a franchise, when that termination would otherwise be valid under the PMPA, would be preempted by the PMPA." *Id.*, 434. Nothing in Act 60 precludes a franchisor from terminating or refusing to renew a franchise agreement or relationship for any PMPA valid ground. In fact, plaintiffs do not claim it does. Aside from losing money, plaintiffs simply argue that they will have on less agreement to find their franchisees in default of. For the reasons described above, that is far from what the First Circuit meant in *Esso Standard Oil Co. v. Department of Consumer Affairs*. *See also Hopkinton Friendly Serv., Inc. v. Glob. Companies LLC*, Civil No. 18-11977 (NMG), 2018 WL 5253287, at *6 (D. Mass. Oct. 22, 2018)("the First Circuit held that the state rent regulation at issue governed a substantive element of the franchise agreement and was thus not preempted by the PMPA.").

The Magistrate Judge also pointed to out-of-circuit cases that address PMPA's preemption. In *Jiménez v. BP Oil, Inc.*, 853 F.2d 268 (4th Cir. 1988) the Fourth Circuit Court of Appeals addressed whether a franchisor must provide state-ordered goodwill payments, to

franchisees when withdrawing from a geographic market. The dispute arose after the defendant

decided to exit the Baltimore-Washington market and sold its retail stations to a third party. The

franchisees rejected the third party's offer of new franchises because the terms were less

favorable. Among others, the assignee prohibited franchisees from operating more than one

station. *Id.*, at 271.

The franchisees sued alleging that the defendant's market withdrawal violated PMPA

and sought goodwill payments. Maryland law provided that, if a distributor terminates or

refuses to renew a marketing agreement without the dealer's consent, they must pay the dealer

the "full value of any business goodwill" the dealer enjoys at that time. *Id*. The franchisees

argued that even if the termination was valid under federal law, the "effects" of that termination

(*i.e.* the loss of business value) were subject to state-mandated compensation. *Id.*, at 272.

The court ruled that the PMPA preempts the Maryland's goodwill provision in the

context of a market withdrawal. The court reasoned that the statute acted as a "toll" or "penalty"

that stood as an obstacle to the flexibility Congress intended to give franchisors to respond to

changing market conditions. *Id.*, at 272-273. Ultimately, the court concluded that because the

Maryland provision was not "the same as" the PMPA, it could not be enforced to require

payments for a termination that was otherwise lawful under federal standards. "Since market

withdrawals without penalty are envisioned under the federal scheme, we find the Maryland

provision, which in effect penalizes BP here in its attempt to withdraw from the Baltimore–

Washington market, is preempted inasmuch as it "stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress." *Jiménez v. BP Oil, Inc.*, 853 F.2d 268, 273 (4th Cir. 1988)(quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Relying in part on *Jiménez v. BP Oil, Inc.*, the Fourth Circuit again struck down state regulation in *Mobil Oil Corp. v. Virginia Gasoline Marketers and Automotive Repair Association, Inc.*, 34 F.3d 220, 223 (4th Cir. 1994). The controversy centered on a statute that sought to regulate various "substantive" terms within franchise agreements rather than the end-game scenarios of termination and nonrenewal. The specific provisions challenged included a prohibition on refiners requiring franchisees to operate more than sixteen consecutive hours per day or six days per week, prohibition on refiners limiting the number of stations a single dealer could operate, prohibition on gasoline purchase or sales quotas, a requirement that rents be based on commercially fair and reasonable standards and applied uniformly, and a mandate that franchise renewals extend for at least three years. *Id.*, at 223-224.

The Fourth Circuit ruled that the PMPA preempted all challenged provisions. The court reasoned that although the state law addressed "substantive" terms, it was ultimately "with respect to" termination and nonrenewal. *Id.*, at 226. The Fourth Circuit held "denying franchisors grounds for termination that are available under the PMPA and… providing franchisees with a remedy unavailable under the PMPA, S.B. 235 impacts franchise termination and nonrenewal to a degree sufficient to fall within this broad preemption clause." *Id.*, at 225.

However, in a strong dissent, then-Chief Judge Erwin explained:

My greatest concern with the majority opinion stems not from what it says, but rather from what it suggests by implication. Each of the Virginia provisions is struck down because it 'narrows the grounds for termination available to franchisors operating in Virginia.' *Ante,* at 224. Because these provisions add or subtract from a ground upon which termination can be predicated, it 'relates to' termination.

But certainly this reaches too far. For under this theory, any changes in state law, not just those particular to the petroleum franchise scenario, that affect the substance of these contract relationships must be struck down (at least as to petroleum franchisees) because they narrow the grounds for termination. There are numerous areas of state law that control a franchise agreement, all of which are subject to this same analytic structure, and thus eligible for limitation. Unfortunately, it is impossible to state with precision which of them are nullified under the majority's approach to this case, because the best we know is that any change in the law that deviates from the status quo ante by altering the grounds for termination, i.e., any change in substantive state law of whatever origin that either an oil company or franchisee does not like, is struck down under this reading of the statute.

*Id*., at 230. Judge Ervin's dissent was not only anchored in his concerns for the future, but also on PMPA's textual borders. First, he explained that PMPA "govern[s] not the substantive contents of the franchise relationship or of a particular franchise contract, but only the reasons…. [it can] be abandoned, a rereading of the preemption provision makes clear the narrowness of its scope." *Id*., at 229. "Given that the only effect of the federal law's provisions is upon the contours… but not upon its content," he added "the limitation of the preemption provision to knocking out only those state laws not 'the same as' the federal law clearly demonstrates that state laws that concern the substantive provisions that either must or may be included in the contract relationship are untouched by the PMPA." *Id*.

Second, he explained that *Jiménez v. BP Oil, Inc.* was decided on very different facts since it invalidated state regulation that required "franchisor[s] to make goodwill payments upon **termination** of a franchise…." *Id.*, at 23 (emphasis added). In the *Jiménez v. BP Oil, Inc.* scenario, preemption was proper because the regulation "interfere[d] with the PMPA's careful regulation of the dos and don'ts of termination or nonrenewal; the congruity in purpose between the PMPA and the Maryland statute was apparent." *Id.*

***

In this Court′s opinion, the question of PMPA preemption raised by plaintiffs starts and end with the text of the statute:

> [t]o the extent that any provision of this subchapter applies to the termination… or to the nonrenewal… of any franchise relationship, no State… may adopt, enforce, or continue in effect any provision of any law or regulation… **with respect to termination**… unless such provision of such law or regulation is the same as the applicable provision of this subchapter….

15 U.S.C. § 2806(a)(emphasis added). Contrary to plaintiffs' general contentions, "[t]he pre-emptive scope of the PMPA is limited." *Mac′s Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, 559 U.S. at 187–88. It "pre-empts only those state or local laws **that govern** the termination… or the nonrenewal of petroleum franchise relationships." *Id.*, at 188 (emphasis added). Thus, the relevant question should be: does Act 60 regulate termination or nonrenewal? It does not.

Express preemption is, of course, out of the question. However, plaintiffs and the Magistrate Judge read PMPA to also preempt non-termination state regulation that could have

an impact on termination or nonrenewal. The Court disagrees. Of course, there is no "infallible constitutional test or an exclusive constitutional yardstick" for resolving preemption questions. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). However, even if examined under the implicit preemption lenses, PMPA preemption is not triggered in this case.

There is no indication that PMPA's regulation of petroleum franchise termination is "so pervasive as to make reasonable the inference that Congress left no room for States" to regulate other aspects of the petroleum franchise business. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Instead, the Supreme Court has explained that "Congress did not regulate every aspect of the petroleum franchise relationship" and "left undisturbed state-law regulation of other types of disputes between petroleum franchisors and franchisees." *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.,* 559 U.S. at 186.

Plaintiffs likewise fail to demonstrate that Act 60 frustrates the accomplishment of the PMPA's objectives. If PMPA's purpose is to protect franchisees from arbitrary termination and to provide a uniform set or termination grounds, non-termination state regulation that forbids franchisor from controlling franchisee's business is no impediment to Congress' objective. Even if the Court overvalued the "flexibility" that PMPA grants to franchisors (interests that is only secondary to the PMP's main purposes), the Court will reach the same determination. Act 60 does not interfere with plaintiffs' ability to withdraw from the market if the other PMPA requirements are meant. Regardless of the scenario, it is difficult to discern how Act 60 "stands

as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. at 67.

The only potentially viable theory advanced (albeit not meaningfully developed by plaintiffs) is one of conflict preemption, namely, that "compliance with both federal and state regulation is physically impossible." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963). Even under that standard, however, preemption of Act 60 is not warranted.

First, plaintiffs remain entitled to invoke the PMPA's grounds for termination or nonrenewal if and when the circumstances so warrant. Act 60 prohibits franchisors from exercising control over the convenience store but leaves all other aspects of the franchise agreements and relationships intact. Second, PMPA neither creates a federal right to enter into a franchise agreement or relationship nor grants a federal right to enter into as many secondary business agreements the franchisor deems profitable and be free from state regulation. By prohibiting control over certain franchised businesses, Act 60 does not encroach on any federal "right." Neither does PMPA grandfather plaintiffs' contractual rights[30] nor shields them from state regulation. The only thing that PMPA impedes is regulation on termination or nonrenewal of petroleum franchise core agreements that does not mirror PMPA's. Said differently, the availability of PMPA "rights" presupposes that the state allows franchise agreements or relationships in the first place. Accordingly, state-imposed limitations on the legality of such agreements or relationships cannot, without more, give rise to a conflict with the PMPA. Fourth,

---

[30] Plaintiffs did not include any claim or challenges under the Contract Clause.

the purposes of the Puerto Rico statute and the federal statute are not the same. As previously explained, Act 60 is an anti-monopolistic measure, whereas the PMPA is a dealer-protection statute.

In the final analysis, there is no "physical impossibility" in complying with both statutes. PMPA requires only that a franchisor satisfy certain conditions if it chooses to terminate a franchise agreement or declines to renew a franchise relationship. The validity and continued viability of those agreements or relationships, however, remain a matter of state law. Here, notwithstanding their inability to exercise control over convenience store operations, plaintiffs retain all PMPA "rights" to terminate any other agreement within the bundle of agreements comprising the franchise, or to decline to renew the franchise relationship, even if as a direct consequence of Act 60.

Likewise, Act 60's private cause of action is not preempted by PMPA. The sole argument for preemption of Act 60's private cause of action is *Esso Standard Oil Co. v. Dep't of Consumer Affs.*'s reasoning that "any law that gave a franchisee a cause of action to contest a termination of a franchise, when that termination would otherwise be valid under the PMPA, would be preempted by the PMPA." *Id.*, at 434. However, very little was argued as to why the cause of action serves to "contest" termination or non-renewal.

A careful reading of Section 3 of Act 60 shows that Puerto Rico's Legislature introduced this private cause of action because Act 3 required parties to rely solely on the Office of Monopolistic Affairs (OAM) of the Puerto Rico Department of Justice, a process that was often

deemed too slow. Act 60, on the other hand, allows any natural or legal person to sue if their business, property, or proprietary interests are harmed by prohibited acts under Act 3, as amended by Act 60 (*i.e.* iolations of Articles 2, 2-A, 4, 4-A, 5, and 5-A of Act 3). These prohibited practices include failing to maintain complete operational dissociation be it under Act 3 or Act 60. Conversely, **it is not available to seek redress from any termination or nonrenewal under PMPA**.

Neither does it affords any relief contrary to PMPA. Under Act 60, a franchisee must first submit a complaint to the OAM. If the OAM does not issue at least a preliminary report within sixty calendar days determining whether to initiate an adjudicative process before the Department of Consumer Affairs (DOCA), the party may then file their claim in state court. On the same day the complaint is submitted to the court, the plaintiff is obligated to notify the OAM of the filing. If the plaintiff prevails in litigation, it is entitled to recover damages for the harm suffered, costs, and a reasonable sum to cover attorney's fees. Evidently, Act 60's cause of action only seeks to deter monopoly and does not grant any relief from any other conduct, including termination or nonrenewal of the franchise.

## IV.   Conclusion

In a nutshell, plaintiffs contend that Act 60 expunges convenience store agreements from the bundle of agreements that comprise the petroleum franchise. That expungement, they assert, leaves them with one fewer agreement subject to PMPA's termination grounds, put differently, one fewer opportunity to catch franchisees in default. In this Court's view, this comes awfully

close to one of the problems PMPA was intended to prevent. *Darling v. Mobil Oil Corp.*, 864 F.2d 981, 984 (2d Cir. 1989)("its paramount objective is to redress disparities in bargaining power and to prevent the ensuing arbitrary termination.").

Beyond the applicable canons of interpretation, plaintiffs' expansive conception of PMPA preemption would effectively immunize petroleum franchisors from state regulation, irrespective of how far off such regulation may be from Congress' purposes in enacting the PMPA. Plaintiffs' reasoning would permit, for example, challenges to state regulation of cigarettes, perishable foods, or liquefied propane gas sold at convenience stores, on the theory that such regulation may incidentally impede their ability to terminate a franchise for failure to meet sales quotas or other benchmarks. This concern for the uncapped expansion of PMPA is particularly worrisome in cases where, as here, the challenge statute does not regulate termination of the franchise.

Act 60 may very well affect plaintiffs' business and,[31] in the long run, may even prove detrimental to consumers in much the same way that other divorcement laws, such as Act 3,[32] arguably may have.[33] That, however, does not mean that Act 60 is preempted by the PMPA. PMPA gives due process and flexibility to franchisors, but it was not enacted to keep their

---

[31] A claim that would more properly be understood as arising under the Contract Clauses of the United States or Puerto Rico Constitutions. Of course, to prevail in that challenge plaintiffs would have to meet a different scrutiny.
[32] Plaintiffs do not challenge Puerto Rico's authority to enact Act 60. Moreover, as previously discussed, Act 60 is merely an extension of the divorcement mandate that has been in place in Puerto Rico since 1978 through Act 3, which already precludes plaintiffs from controlling petroleum retail businesses. Plaintiffs have neither challenged nor cited authority calling such state powers into question.
[33] The Court has carefully reviewed all the record, including all the documents and testimony that challenge the wisdom of Act 3 and Act 60. However, all that information is irrelevant for preemption purposes.

business profitable. Neither was it enacted to allow them to have federally protected rights over the portion of the franchised business that generates the most profits. If anything, and under certain conditions, PMPA allows the franchisor to withdraw from the market or take other action expressly stated in PMPA if the business is no longer lucrative in a market due to, for example, Act 60.

In light of all the above, the Court disagrees with the Magistrate Judge's recommendation. Thus, the Court **SUSTAINS** the Objections at **ECF Nos. 311**, **318**, and **REJECTS** the R&R at **ECF No. 304**. Thus, the motions for summary judgment at **ECF Nos. 206, 210** are **GRANTED** only as to the requests to **DISMISS** the complaints; the cross-motions for summary judgment filed by plaintiffs at **ECF Nos. 221, 236,** and **245** are **DENIED**.[34]

---

[34] Alternatively, in consideration of Puerto Rico's police powers, together with the absence of any assertion by plaintiffs that Act 60 has affected them, or that they possess grounds or an intent to terminate a franchise under the PMPA but are prevented from doing so by Act 60, the Court would have decline to grant extraordinary relief in the form of a declaratory judgment or injunction in this case.

The Declaratory Judgment Act "created an opportunity, rather than a duty, to grant a new form of relief." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). Because such relief is "nonobligatory" in nature, "a district court is authorized, in the sound exercise of its discretion ... to dismiss an action seeking a declaratory judgment before trial." *Id.* That said, as previously explained, the Court's decision to deny declaratory judgment rests on a careful consideration of the facts and the applicable law.

Similarly, the "decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court…." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[34] A court may issue such an injunction if it concludes "(1) that a party has suffered—or, as here, will suffer—an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 13 (1st Cir. 2013)(quoting id). "The first two factors together require a substantial injury that is not accurately measurable or adequately compensable by money damages." *Id*. (quoting *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000)). Plaintiffs do not put forward any convincing arguments for the Court to conclude that they meet the first two and last factors of the injunctive test. Neither do they claim that declaring Act 60 federally preempted serves public interest.

Clerk of Court shall enter judgment dismissing the complaints with prejudice.

The Court will hear from the parties on defendants' request for attorney's fees due to the protracted discovery and the inclusion of meritless causes of actions that did not make it to the summary judgment stage. Defendants are granted 15 days to move for such relief, if any at all. Plaintiffs may file a response within 15 days thereafter. The filings shall not exceed 20 pages in length.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 31st day of March 2026.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**